1

2

3

4

5

6                    **UNITED STATES DISTRICT COURT**

7                    **EASTERN DISTRICT OF CALIFORNIA**

8

9   **GINA CARUSO,**                           **CASE NO. 1:15-CV-780 AWI EPG (PC)**

10                    **Plaintiff**

11          **v.**                             **ORDER ON THE PARTIES' MOTIONS IN LIMINE**

12   **OFFICER G. SOLORIO, OFFICER C.**
     **LOPEZ, SGT. G. INGRAM, and**
13   **OFFICER D. MARTINEZ,**                   (Doc. Nos. 244, 245, 246, 247, 248, 253, 259)

14                    **Defendants**

15

16

17          This case arises out of an encounter between incarcerated Plaintiff Gina Caruso ("Caruso")

18   and Defendant prison guards G. Solorio ("Solorio"), C. Lopez ("Lopez"), D. Martinez

19   ("Martinez"), and Sgt. G. Ingram ("Ingram") (collectively "Defendants").[1]  The operative

20   complaint is the Second Amended Complaint ("SAC").  The SAC contains two viable claims

21   under 42 U.S.C. § 1983, an Eighth Amendment claim for excessive force and a Fourth

22   Amendment claim for an unreasonable search.  Currently before the Court are Caruso's six

23   motions in limine and Defendants' thirteen motions in limine.  This order resolves the parties'

24   respective motions.[2]

25

26   _____

27   [1] The parties are familiar with the facts of this case.  A thorough description of the facts can be found in the Court's order on Defendants' motion for summary judgment.  See Caruso v. Solorio, 2020 U.S. Dist. LEXIS 51994 (E.D. Cal. Mar. 25, 2020).

28   [2] Because some of the motions in limine are related, the Court will resolve some of the motions out of order.

**I.**     **Defendants' Motion in Limine No. 1 – Limit Caruso's Fourth Amendment Claim**

*Defendants' Argument*

Defendants argue that Magistrate Judge Grosjean screened the complaint and found that allegations surrounding the handcuffing stated a claim.  However, the analysis was limited to Defendants disregarding a medical chrono by cuffing Caruso behind her back and jerking her arms back knowing they were causing severe pain.  That is, the screening order found that the relevant conduct occurred immediately outside of Caruso's cell or inside Caruso's cell.  There is no discussion of Caruso's escort from her cell, through the dayroom and courtyard, and to the ISU Building.  Thus, the escort from the cell is not a basis for an Eighth Amendment claim.  The Court ratified the screening order.  Caruso did not object to the Court's screening order, nor did Plaintiff seek leave to amend to expand on the scope of the excessive force claim.  Defendants have also been precluded from taking discovery on this expanded claim because discovery closed on May 25, 2018.  Therefore, the Court should limit the scope of the Eighth Amendment claim to exclude conduct during and after the escort out of Caruso's cell.

*Plaintiff's Opposition*

Caruso argues that from the outset of the case, she has complained about the duration and manner of handcuffing.  There is nothing in the screening order of the First Amended Complaint ("FAC") to suggest that the Magistrate Judge dismissed any aspect of the Eighth Amendment handcuffing claim, and the analysis of the handcuffing claim was adopted/reiterated as part of the screening order of the SAC.  The SAC alleged that Defendants ignored Caruso's requests to be cuffed in front, kept her handcuffed behind her back while in the cell and pulled her arms up causing her pain, kept her handcuffed behind her back while in the wheelchair, maliciously jerked her arms above the wheelchair, she was handcuffed behind her back in the ISU office, and was kept handcuffed behind her back for a total of six hours until she was in Administrative Segregation ("Ad Seg").  There is no authority that screening orders should be applied in such a way as to limit the factual basis for cognizable claims.  Caruso argues that the fact the Defendants handcuffed her behind her back for six hours throughout the time she was in ISU, in the holding cell, and until she was placed in an Ad Seg shower, are relevant to her handcuffing claim and

1   within the scope of discovery that Defendants were entitled to take.  The duration of a deprivation
2   must be considered in evaluating an Eighth Amendment claim.  A key issue is how long it was
3   appropriate for "ISU staff" to disregard Caruso's cuffing restrictions.  Any exclusion of evidence
4   that the handcuffing continued beyond the search conducted at her cell would severely limit her
5   ability to show that Defendants' manner of handcuffing was malicious and sadistic.  Caruso also
6   argues that the six hours of handcuffing is necessary to dispute Defendants' justification for
7   handcuffing her behind her back.  Defendants have justified handcuffing Caruso behind her
8   because she continued to resist and disobey direct orders while harboring contraband.  However,
9   by Defendants' own testimony, Caruso was cooperative after the drugs were retrieved.  Thus,
10  there was no justification for keeping her improperly handcuffed in violation of her chrono and the
11  Eighth Amendment.  Finally, Caruso argues that the abusive six hour duration of her handcuffing
12  is relevant to the amount of pain and suffering that she endured, i.e. damages.

13          *Reply*

14          Defendants reply that Caruso is improperly attempting to expand the scope of her
15  excessive-force claim.  The screening order found that the cognizable Eighth Amendment claim
16  was based on behind the back cuffing and jerking Caruso's arms while she was in her cell.  Caruso
17  is not attempting to introduce evidence of how long she was handcuffed, rather she is attempting
18  to introduce evidence of a separate and distinct handcuffing incident.  After Defendants escorted
19  Caruso from her cell, conducted a clothed body search, wheeled her to another location, removed
20  her handcuffs, and conducted a visual body search, Caruso now alleges that she was again placed
21  in handcuffs and remained in handcuffs in Ad Seg for some period of time.  This is a distinct
22  incident that goes far beyond the Court's screening orders.  Moreover, there is no evidence that the
23  Defendants were responsible for Caruso being handcuffed a second time, the manner in which she
24  was handcuffed, or how long she remained in handcuffs.  Defendants Martinez and Ingram
25  remained in the cell to conduct a search while Lopez and Solorio took Caruso for another search in
26  the ISU office.  The Court explicitly found that Caruso's other extraneous allegations concerning
27  handcuffing, beyond the initial handcuffing, did not form the basis of an Eighth Amendment claim
28  (citing Doc. No. 18 at pp. 7-8).  Defendants should be entitled to rely on the screening orders.

1    *Discussion*

2        Initially, reliance on allegations made in the Original Complaint and FAC is improper.

3    The SAC supersedes all prior complaints; once an amended complaint is filed, the prior

4    complaints are no longer operative and are treated as non-existent.  Ramirez v. County of San

5    Bernardino, 806 F.3d 1002, 1008 (9th Cir. 2015): Loux v. Rhay, 375 F.3d 55, 57 (9th Cir. 1967).

6        With respect to the SAC, in relevant part, Caruso alleged that: she was instructed by Lopez

7    to put her hands behind her back; Caruso said she had a cuff in front chrono due to a spinal

8    surgery; Martinez came in and ordered Caruso to put her hands behind her back; Caruso attempted

9    to comply and again said she had a cuff in front chrono; Caruso was cuffed behind her back;

10   Solorio jerked the cuffs up causing Caruso's legs to buckle and her to scream in pain; Caruso

11   asked Solorio to stop because of the chrono and her surgery; Ingram came in and she told him that

12   she had a cuff in front chrono due to a spinal injury; Caruso told Ingram that her chrono was on

13   her locker door; Ingram stated that he saw no chrono even though the chrono was hanging on the

14   locker door; Ingram ordered Lopez and Solorio to take Caruso to the cell shower for a strip search;

15   as Martinez and Ingram left the cell, Solorio pulled up on the cuffs which caused Caruso to scream

16   and fall to the floor; Solorio tried to pull Caruso off the floor, which caused more pain; Lopez

17   conducted a pat down search and retrieved a cell phone from Caruso's underwear; a strip search

18   was then conducted and in the process, Ingram jerked up on the cuffs causing Caruso to scream;

19   Solorio then pulled down Caruso's pants and retrieved drugs from between Caruso's buttocks and

20   near (but not in) her anus; after the search, Defendants kept Caruso cuffed behind her back and

21   made her sit at an angle in a wheelchair so that her back was at the right corner of the wheelchair;

22   Lopez walked alongside the chair and forced Caruso's cuffed hands to go over the arm and back

23   of the wheelchair, causing Caruso to lean forward and cry out to please stop and to get medical

24   attention; Ingram said to make sure that Caruso did not fall out of the chair; Lopez released

25   Caruso's hands and grabbed a bed sheet to tie Caruso into the wheelchair; Lopez then jerked

26   Caruso's hands over the arm of the chair so that she could watch Caruso's hands; Caruso in tears

27   asked Lopez to cuff her in front and not keep her hands over the side of the chair; Caruso said that

28   Defendants knowingly and willfully inflicted pain on her and disregarded the chrono; Lopez and

Solorio pushed the chair to the ISU office and kept Caruso's hands over the arm of the wheelchair the entire time; Lopez and Solorio told Caruso that they were going to do a strip search and then call medical; Caruso was untied from the wheelchair, stood up, and the cuffs were taken off of each hand; Caruso had been cuffed for an hour at that point; a strip search and cavity search was conducted by Solorio and Lopez; after the search, Lopez and Solorio again cuffed Caruso behind her back; Caruso again mentioned her chrono but Lopez and Solorio said they would ask medical; Caruso sat in a chair in front of a doorway waiting for medical; once Nurse Franco from medical arrived, Caruso said that she was in acute pain and that she was not to be cuffed behind the back; Franco said that he was told just to do the 7219 (Ad Seg form) and that he did not know and could not help her with the chrono; Caruso was left in cuffs behind her back for hours even when she was placed in a cage during count time; in the Ad Seg shower, she was finally uncuffed at about 6:30 p.m.; Caruso had been in cuffs for a total of about 6 hours. See Doc. No. 22.

The Magistrate Judge's screening order of the SAC for the handcuffing claim essentially readopted the screening order analysis of the FAC, without elaboration. See Doc. No. 24 ("For the reasons laid out in the Court's prior order (ECF No. 18), the Court once again finds that Plaintiff has stated a claim for excessive force in violation of the Eighth Amendment against Defendants Ingram, Martinez, Lopez, and Solorio."). In relevant part, the screening order of the FAC held:

> The part of Plaintiff's complaint that is troubling is the allegation regarding handcuffing. Plaintiff alleges that she had a chrono requiring front handcuffs, but that defendants ignored this chrono and used handcuffs on her back without justification. Plaintiff alleges that she immediately told defendant Lopez about her medical chrono. Defendant Lopez ignored this and told Plaintiff to put her hands behind her back. Plaintiff again told Defendants Lopez and Martinez that she has a chrono only to be cuffed in front because of a spinal cord injury that left Plaintiff paralyzed until she received surgery. Defendant Ingram then came into the room and Plaintiff asked him to please help because she has a medical chrono that states that Plaintiff should only be cuffed in front due to severe pain. Defendant Ingram allegedly said, "[I] don't see no chrono" and Plaintiff said it was directly in front of him on her locker door. *Despite this, Defendants Ingram, Martinez, Lopez and Solorio disregarded the medical chrono by cuffing Plaintiff behind her back and jerking her back knowing they were causing severe pain.*
>
> The Court finds that the allegations about this aspect of the search state an Eighth Amendment claim for excessive force. It may be that Plaintiff's allegations are incorrect, or that Defendants had a legitimate reason for ignoring the medical chrono. However, construing the allegations in favor of Plaintiff, the Court will

1   allow this claim to go forward as to Defendants Ingram, Martinez, Lopez, and
    Solorio.

2   Doc. No. 18 at 7:24-8:13 (emphasis added).  The Court adopted the screening order of the SAC,

3   which is the same as adopting the analysis of screening order of the FAC.

4        The Court finds that the key to the handcuffing claim is a combination of the allegations

5   actually made in the SAC combined with the last sentence of the first paragraph quoted above

6   from the screening order.  The screening order analysis is largely based on the events that

7   happened in the cell.  However, it is not expressly limited to those events.  The analysis was

8   concerned about "handcuffing."  The analysis then focuses on Defendants ignoring both the pleas

9   about, and the location of, the chrono for front cuffing.  It concludes by stating that Defendants

10  "disregarded medical the medical chrono by cuffing Plaintiff behind her back and jerking her back

11  knowing they were causing severe pain."  Id.  That is, the conduct that was found to violate the

12  Eighth Amendment was a combination of front cuffing in violation of the chrono and Caruso

13  being jerked around by the cuffs which resulted in severe pain.  See id.  Consistent with the

14  screening order, the allegations in the SAC describe Defendants ignoring Caruso's cries of pain,

15  requests that she be cuffed in front, and that she had a cuff in front chrono.  However, those

16  allegations are not limited to just actions in the cell.  Allegations of back cuffing and

17  jerking/maneuvering to cause pain are alleged in the cell and in the wheelchair as Plaintiff is being

18  wheeled to the ISU office to be strip searched.  The handcuffs were removed for an unknown

19  period of time in the ISU office.  Thus, the handcuffing that started in the cell ended in the ISU

20  office once the cuffs were removed.

21       It is true that Caruso alleges that she was cuffed again in the ISU office and taken to Ad

22  Seg.  But there are no allegations that any Defendant (and only Lopez and Solorio were present

23  because Ingram and Martinez were searching the cell and did not go to the ISU office)

24  maneuvered the handcuffs in any way to cause pain.  A violation of the chrono does not equal an

25  Eighth Amendment violation, and the screening order never so held.  Without objections or

26  clarifications, the most reasonable reading of the screening order is that the cognizable claim was

27  based on ignoring the chrono combined with maneuvering that caused pain.  The chrono is

28  relevant not because it sets any Eighth Amendment standard, it is relevant because it lends

1    credence to the idea that behind the back cuffing, which is normally a standard practice, could

2    cause pain and/or injure Caruso.

3         In sum, because the only allegations in the SAC that deal with behind the back cuffing and

4    maneuvering that caused pain deals with a period of time from when the Defendants entered the

5    cell to the strip search at the ISU office, that is the basis of the Eighth Amendment excessive force

6    claim in this case.

7         To the extent that Caruso wants to pursue a claim based on the cuffing from the ISU office

8    to the removal of the handcuffs in Ad Seg, she needs to file a motion to amend.  The motion to

9    amend must meet the standards of Federal Rules of Civil Procedure ("FRCP") 15 and 16 because

10   a scheduling order that set discovery deadlines was issued in this case.  Additionally, such a claim

11   would likely be limited to conduct by Lopez and Solorio because Martinez and Ingram were not

12   present once Caruso was wheeled away to the ISU office for a full strip search.  Also, it is unclear

13   whether Lopez and/or Solorio were responsible for keeping the cuffs on Caruso for the full period

14   of time between the ISU search and Ad Seg placement (about 5 hours).  If non-defendant prison

15   staff kept the handcuffs on Caruso, it would be very difficult for any Defendant to be responsible

16   for that conduct.[3]

17        With respect to Caruso's arguments regarding the admissibility of the full 6 hour duration

18   of cuffing, Caruso states that the duration of the cuffing is relevant to evaluating the Eighth

19   Amendment in general.  The Court agrees that duration is a consideration for Eighth Amendment

20   claims.  However, Caruso overlooks the fact that there are at least two separate phases of

21   handcuffing.  The most clearly troublesome conduct occurred between the cell and the ISU office,

22   about one hour.  Caruso's allegations show that the handcuffs were removed, and a strip search

23   was conducted at the ISU office.  In other words, one phase of handcuffing had ended because the

24   cuffs were removed.  The second phase occurred when only two defendants were present and after

25   the strip search had occurred.  During the second phase, there are no allegations that Caruso was

26   maneuvered in any way to cause pain or that she was clearly experiencing or voicing a similar

27

28   _____
     [3] The Court is not holding that Caruso has a cognizable claim or that a motion to amend would be granted.  The Court
     is merely holding that if Caruso wishes to pursue a cuffing claim based on being cuffed from the time the strip search
     ended in the ISU office to the time that the cuffs were removed in Ad Seg, then she must follow FRCP 15 and 16.

1   kind of pain as in the cell and wheelchair trip.  Additionally, Caruso states that the 6 hour duration

2   is relevant for damages.  However, again, there are at least two phases of handcuffing, and the

3   only allegations that clearly support damages (due to expressions of repeatedly voiced pain) deal

4   with the first phase.  The Court is aware of no allegations or disclosed evidence that sufficiently

5   indicate that Caruso suffered any damages from the second phase of handcuffing.

6           *Ruling*

7           Defendants' first motion in limine is granted in part.  Caruso's Eighth Amendment

8   excessive force/handcuffing claim is limited temporally from the period of time between

9   Defendants entering the cell to the time that the handcuffs were removed at the ISU office as part

10  of a strip search.  This limitation is  consistent with the allegations in the SAC and the analysis of

11  the screening order that "Defendants Ingram, Martinez, Lopez and Solorio disregarded the medical

12  chrono by cuffing Plaintiff behind her back and jerking her back knowing they were causing

13  severe pain."  Doc. No. 18 at 7:24-8:13.  Additionally, as explained above, Caruso is not

14  precluded from filing a motion to amend with respect to the second handcuffing phase.

15

16  **II.     Plaintiff's Motion in Limine No. 2 – Exclude Testimony of Jeanne Woodford**

17          *Plaintiff's Argument*

18          Caruso argues that Defendants intend to call her former expert, Jeanne Woodford, as a

19  defense witness at trial.  However, Defendants were notified in November 2019 that Woodford

20  was no longer serving as an expert due to medical issues and the closure of her consulting practice.

21  Prior to the withdrawal, Defendants deposed Woodford for less than 1 hour in August 2019.

22  Defendants apparently wish to admit testimony from Woodford that the initial handcuffing was

23  appropriate.  Woodford's testimony should be excluded because she is unavailable due to medical

24  issues.  Further, Woodford's expert testimony would not be admissible on the handcuffing claim

25  for the limited purpose of showing that the initial handcuffing was appropriate.  Woodford opined

26  that Defendants could have easily confirmed that Caruso had a cuff in front chrono once Caruso

27  became cooperative.  Additionally, the Eleventh Circuit has recognized that prejudice can result

28  when jurors learn that an expert was originally consulted by an opposing party.  Finally, Woodford

8

1    is beyond the 100 mile rule for trial subpoenas under FRCP 45(c)(1)(A).  Woodford resides in

2    Benicia, California, which is nearly 200 miles away from Fresno.  Due to Woodford's inability to

3    drive on freeways, as well as her medical issues, it would be a substantial hardship for her to

4    testify at trial, regardless of which party calls her.

5            *Defendants' Opposition*

6            Defendants argue that there is no per se rule against calling an opposing party's expert

7    because, once a report has been submitted or testimony given, those opinions are those of the

8    "case," not a particular party.  Defendants wish to present one opinion to the jury, that the initial

9    handcuffing of Caruso behind her back was appropriate.  There is no need to inform the jury that

10   Woodford was Caruso's former expert.  The testimony is not cumulative of other experts, and

11   Caruso is free to elicit any helpful information/opinions of Woodford on cross-examination.

12   Finally, the testimony will be short.  Woodford's deposition lasted 48 minutes and covered seven

13   opinions; Defendants intend to illicit only one of those opinions.  In terms of unavailability, there

14   has not been a sufficient showing that Woodford's medical conditions are of such a nature, degree,

15   and duration that they make Woodford "unavailable" for trial.  But even if Woodford is

16   unavailable, her deposition testimony can be read to the jury, and Caruso can read any relevant

17   portions.

18           *Plaintiff's Reply*

19           In reply, Caruso states that she does not oppose Defendants' request to admit the

20   deposition testimony Woodford under Federal Rule of Evidence ("FRE") 804.  To avoid

21   prejudice, the deposition testimony should be presented by all parties, the jury should not be told

22   that Woodford was Caruso's expert, and all deposition testimony relating to handcuffing should be

23   admitted (pursuant to FRCP 32(a)(6)).

24           *Discussion*

25           Defendants have not responded to the FRCP 45 objection.  Caruso cites this portion of

26   FRCP 45:  "A subpoena may command a person to attend a trial, haring, or deposition only as

27   follows:  (A) within 100 miles of where the person resides, is employed or regularly transacts

28   business in person; or."  Fed. R. Civ. P. 45(c)(1)(A).  However, FRCP 45(c)(1)(B)(ii) reads:  "A

1   subpoena may command a person to attend a trial, haring, or deposition only as follows: . . . (B)

2   within the state where the person resides . . . if the person: . . . (ii) is commanded to attend a trial

3   and would not incur substantial expense." Woodford resides in California and would be ordered

4   to attend trial.  There is no evidence regarding any expense that she would incur by an order to

5   attend.  Therefore, the Court has sufficient subpoena power under FRCP 45(c)(1)(B)(ii) to order

6   Woodford to appear.

7          Nevertheless, Woodford has declared that she withdrew as an expert in this case due to

8   medical concerns and that she closed her consulting practice.  See Doc. No. 249.  She states that

9   she continues to have medical issues that interfere with her ability to work.  See id.  She also

10  declares that, because she has concerns about her ability to drive, she avoids freeways.  See id.

11  She declares that she lives in Benicia, California, which is 191 miles from Fresno.  See id.

12         The Ninth Circuit has recognized that, when evaluating whether a witness is "unavailable"

13  under FRE 804(a)(4), courts consider:  (1) the nature of the infirmity, (2) the expected time of

14  recovery, (3) the reliability of evidence concerning the infirmity, and (4) other special

15  circumstances.  See United States v. McGuire, 307 F.3d 1192, 1205 (9th Cir. 2002).  Here,

16  Woodford's precise medical issues are and any expected time for recovery are unknown.

17  However, Woodford was withdrawn as an expert because of these medical issues in November

18  2019 and they were sufficiently severe that they caused Woodford to close her consulting practice.

19  Therefore, while it is unknown what precisely ails Woodford, the Court is satisfied that these two

20  considerations (her withdraw in November 2019 and the closure of her consulting practice)

21  constitute "special circumstances" that demonstrate that she is medically unavailable for purposes

22  of the hearsay rule.

23         With the finding that Woodford is unavailable for purposes of FRE 804, there is in

24  actuality no further dispute between the parties.  Through FRE 804 and FRCP 32(a)(6),[4] the

25  parties will be able to present to the jury any relevant opinions regarding handcuffing.  The parties

26  may present the deposition testimony as they deem fit (reading the relevant questions and answers,

27  ─────────────────────

28  [4] Rule of Civil Procedure 32(a)(6) reads:  "If a party offers in evidence only part of a deposition, an adverse party may require the offeror to introduce other parts that in fairness should be considered with the part introduced, an any party may itself introduce any other parts."

1   have an attorney read a question and another attorney read the answer, or having the Court read

2   the relevant questions and answers).  The Court will inform the jury that Woodford was an expert

3   witness in this case who is no longer available and that the jury shall consider her deposition as if

4   she were testifying live in court.  No party will mention that Woodford was Caruso's former

5   expert.

6        *Ruling*

7        Caruso's second motion in limine is denied in part.  Because Woodford is medically

8   unavailable, Woodford's deposition testimony will be presented to the jury through FRCP 32(a)(6)

9   and FRE 804(b)(1) (former testimony of an unavailable witness), the jury will be informed that

10   Woodford is an expert witness who is no longer available (without identifying her as a plaintiff's

11   expert or defense expert), and the parties are to meet and confer regarding the method of

12   presenting Woodford's testimony.

13

14   **III.**     **Plaintiff's Motion in Limine No. 1 - Limit the Testimony Jeffrey Watkins**

15        *Parties' Arguments*[5]

16        Caruso argues that any opinions regarding her Eighth Amendment handcuffing claim that

17   Watkins may have should be excluded because they were not disclosed and, alternatively, should

18   be excluded under Rule 702 as unhelpful and based on inadequate facts.

19        Defendants argue that they intend to call non-retained expert Lt. Jeffrey Watkins to testify

20   that:  (1) the initial clothed body search of Caruso was reasonable under the circumstances; and (2)

21   initially handcuffing Caruso and then holding her up by her arms when she went limp was

22   reasonable.  Watkins will not opine regarding the propriety of handcuffing Caruso behind her back

23   if Caruso's expert Woodford is permitted to address the issue.

24        *Discussion*

25        First, there does not appear to be a dispute regarding any opinions that Watkins may have

26   that relate to the Fourth Amendment search issue.  The parties appear to agree that those opinions

27

28   [5] Because there are relatively few disputes regarding this motion, the Court provides only a thumbnail of the parties' arguments.

1  should be limited by Watkins' report and events occurring at the deposition.  With that customary

2  limitation, there are no issues regarding Fourth Amendment opinions.

3         Second, with respect to "use of force" opinions, Defendants want to offer an opinion that

4  they used an appropriate amount of force to lift Caruso up after she went limp.  That is not the

5  force at issue.  The force at issue is the use of handcuffs behind Caruso's back and maneuvering

6  her to cause her unnecessary pain.  Thus, any opinion about the reasonableness of the force to lift

7  Caruso is not helpful and will be excluded as "unhelpful" under FRE 702.[6]

8         Third, the real dispute in this motion is Watkins's opinions regarding the propriety of

9  handcuffing Caruso.  However, Defendants indicate that Watkins's opinions on that subject will

10 not be presented to the jury so long as the testimony of Woodford is permitted.  As explained

11 above, the deposition testimony of Woodford regarding handcuffing is admissible and will be

12 permitted.  Therefore, based on Defendants' representations, the Court will exclude Watkins's

13 handcuffing opinions as contingently moot.

14        *Ruling*

15        Caruso's first motion in limine is granted in that Watkins's opinions are limited to those

16 expressed in his report and deposition testimony, is granted with respect to Watkins's opinion

17 about lifting Caruso since that application of force does not form the basis of any claim, and is

18 granted with respect to Watkins's handcuffing opinions because Woodford's testimony on that

19 subject will be presented to the jury.

20

21 **IV.     Plaintiff's Motion in Limine No. 4/Defendants' Motion in Limine No. 7 – Earlier**

22 **         Draft Incident Report & Discovery Related Conduct**

23        *Plaintiff's Argument*

24        Caruso argues that the history of the Defendants' production issues related to their

25 individual incident reports was thoroughly briefed in the sanctions motion (which was granted in

26 part by the Magistrate Judge).  Caruso states that she intends to introduce evidence at trial

27

28 ───────────────
[6] This does not mean that testimony regarding lifting Caruso up will be excluded.  Rather, any opinions regarding the propriety of lifting Caruso up will be excluded because the jury will not be asked to make any determinations regarding lifting Caruso up.

1   regarding a draft incident report, which was prepared prior to the amended incident report that was
2   reviewed by defense expert Watkins and for which Defendants are expected to rely upon at trial.
3   To date, Defendants have not produced a signed original incident report.  Despite numerous
4   orders, Defendants did not produce the draft incident report until February 28, 2019, and prior to
5   February 2019, produced only the amended report.  The changes reflected in the amended incident
6   report, as well as the Defendants' delay in producing the draft report, are admissible and highly
7   relevant to Defendants' credibility.

8          Caruso also states that she has no intention of introducing evidence of the discovery
9   sanctions that were imposed against Defendants.  However, Caruso argues that she is entitled to
10  introduce evidence regarding the absence of original incident reports prepared by Lt. Villegas and
11  each Defendant.  Lt. Villegas testified that, based on his review of the original reports of the
12  Defendants, he concluded that Caruso was not aggressively resisting staff.  This is highly
13  probative because Defendants have repeatedly argued that they were justified in handcuffing
14  Caruso behind her back because she continued to resist and disobey orders.  Caruso argues that
15  she is entitled to introduce evidence explaining her efforts to obtain the original reports, as well as
16  Defendants' explanation for why the original reports were not produced.  Thus, while the
17  discovery sanction itself will not be discussed, Caruso argues that the conduct underlying the
18  discovery sanction may be explained to the jury.

19         Finally, Caruso argues that she is unable to identify the differences between the amended
20  incident report and the original incident report because the original was never produced.  Caruso
21  argues that she has no way to confirm that the amendments to the original report were limited to
22  those listed in the amended incident report.  By withholding or destroying the original incident
23  report, Defendants should not be allowed to exclude evidence suggesting that the original incident
24  report may have been modified in more material ways than what is indicated in the amended
25  report.  Caruso argues that more briefing is necessary to determine how to address the issue of the
26  missing original reports.  Also, Defendants again assert that the original signed incident reports do
27  not currently exist.  Contrary to Defendants' opposition that there is no evidence that the original
28  reports do not exist, Defendants' interrogatory response stated that the litigation coordinator at

1   CCWF believed that the original incident reports had likely been purged.  The Magistrate Judge,

2   in the course of sanctioning Defendants, did not sanction Defendants for purposeful spoliation, but

3   noted that Caruso would not be barred from later presenting evidence to show that another version

4   of the incident report existed at some time.  All of this evidence, as well as other evidence, will be

5   presented by way of a separate pre-trial motion.  Caruso also notes that, despite the representation

6   that Defendants are not the custodians of the original incident reports, Defendant Martinez was the

7   ISU Evidence Officer and, in that role, had the ability, authority, and obligation to preserver and

8   retrieve the original incident reports; Lopez continues to work in ISU and thus has the continued

9   ability to search ISU for the missing reports.  In order to determine whether a permissive or

10  mandatory adverse instruction is warranted at trial to address the missing original incident reports,

11  Caruso states that she will file a subsequent motion.

12        *Defendants' Arguments*

13        Defendants agree that Caruso may ask Defendants about the fact that different drafts of

14  their incident reports exist and that she may inquire about the differences between the final reports

15  and the drafts.  However, Caruso should not be able to offer testimony or evidence about the

16  timing of the production of those documents or the Magistrate Judge's discovery sanctions.  All

17  documents in existence have been produced to Caruso, and the timing of the disclosure does not

18  affect the facts at issue.  Evidence of these ancillary issues is irrelevant and confusing under FRE

19  403.  All evidence regarding discovery disputes and conduct should be excluded.

20        *Discussion*

21        Initially, the parties appear to agree that the jury should not be informed of the discovery

22  sanctions ordered against Defendants by the Magistrate Judge.[7]  Additionally, there is no dispute

23  that Caruso can utilize the draft incident report to question Defendants and compare that draft to

24  the amended incident report.  Caruso can also ask each Defendant about any original signed

25  reports, including what each Defendant did with their original unamended signed incident report

26  and about what differences exist between the original signed report and the amended report.

27  _____

28  [7] The Court notes that Defendants requested that the Court reconsider Magistrate Judge Grosjeans's sanctions order.  See Doc. No. 214.  On November 25, 2020, the Court denied Defendants' motion for reconsideration.  See Doc. No. 286.

1    Beyond the above, Caruso has not shown that any other facets of her attempt to obtain all
2    versions of the incident report are admissible.  There is no question that Caruso requested the
3    original report numerous times, and nearly every time, she was informed that only the amended
4    report existed.  See Doc. No. 221 (amended sanctions order).  However, as explained in the
5    sanctions order, Defendant Ingram found the draft report in July 2018, but the draft report was not
6    produced to Caruso until February 2019.  See id.  Between those dates, Caruso was told that no
7    other reports existed except for the amended incident report, which had been previously produced.
8    See id.  Ingram's deposition testimony indicates that he informed the prison Litigation
9    Coordinator that the draft report had been found, but he was told by the Litigation Coordinator that
10   the coordinator already had a copy.  See id.  Defendants were sanctioned for failing to produce the
11   draft report sooner and failing to follow a number of court orders to produce other versions of the
12   draft report.  See id.  The sanction was the costs.  See id.  However, the sanctions order also
13   included the following findings:  (1) it appeared that all remaining drafts had been produced; (2) it
14   could not be determined whether other versions of the incident report existed; (3) nothing would
15   prevent Caruso from presenting evidence that another version of the report existed at some time;
16   (4) the order could not find that Defendants continue to withhold additional versions of the
17   incident report; (5) the amended incident report identifies changes made, which reduces the
18   prejudice to Caruso (even though it is unclear whether the notation reflects all changes made); (6)
19   sanctions for any alleged concealment of versions of the incident report were inappropriate; (7) the
20   order could not find that Defendants purposefully destroyed discovery in order to conceal
21   information; and (8) although facts regarding any "purging" of the original reports was far from
22   clear, there was insufficient evidence of purposeful spoliation.  See id. at 12:8-13:5.
23   While the above findings in the sanctions order are all significant, several are key to
24   resolving these motions in limine.  The sanctions order could not find purposeful destruction of
25   any documents, all existing versions of the incident report appear to have been produced, and there
26   was an insufficient indication of spoliation to warrant spoliation sanctions.  The Court is aware of
27   no reason to  deviate from these findings.  Consistent with these findings, any further instructions,
28   evidence, or testimony regarding the discovery efforts and actions associated with the incident

reports will not be permitted.  There are clear FRE 403 concerns regarding confusion and using an

inordinate amount of trial time on relatively tangential issues, particularly when there has been a

finding that the facts are not sufficient to support a finding of spoliation or purposeful destruction.

The facts are that Caruso has all documents in existence and there is a finding that essentially

eliminates the spoliation issue.

>   *Ruling*

Defendants' seventh motion in limine and Caruso's fourth motion in limine are granted in

part and denied in part.  Caruso will be permitted to admit the draft incident report and amended

incident report and may ask Defendants any relevant questions regarding any version of the

incident report (original, draft, or amended).  Pursuant to FRE 403, no evidence or argument

regarding discovery sanctions, discovery history, and discovery conduct regarding production of

any version of the incident report will be permitted.[8]

# V.   **Plaintiff's Remaining Motions in Limine**

## 1.   **Motion in Limine No. 3 – Exclude Criminal & Disciplinary History of Caruso and All Prisoner Witness**

>   *Plaintiff's Argument*

Caruso argues that none of the Defendants had met her or were aware of her criminal or

disciplinary history prior to the July 22, 2013 incident.  Thus, Defendants could not have been

influenced by Caruso's criminal or disciplinary history, making it irrelevant to the claims at issue.

The same is true of Caruso's inmate witnesses.  Relatedly, because there is no relevance to the

claims that must be decided, the criminal and disciplinary history of the inmate witnesses and

Caruso is unduly prejudicial under FRE 403.  Further, use of the disciplinary and criminal

histories also implicates improper character evidence under FRE 404(b).  These histories do not

support any permissible FRE 404(b) purposes.  Finally, Caruso requests two exceptions from

---

[8] Caruso indicates that additional briefing is warranted.  The Court tends to disagree.  Nevertheless, the Court will not prohibit Caruso from filing additional motions.  Caruso must be cognizant of the analysis of this order and the sanctions order in which the evidence was found to be insufficient to support any sanctions or actions relating to spoliation.  Failure to adequately address the analysis of this motion or the sanctions order will result in the summary denial of Caruso's motion through citation to this order and the sanctions order.

exclusion:  the fact of conviction that resulted from the July 22 incident (the parties have agreed to a preliminary statement) and a July 3, 2013 search of Caruso's cell.

In reply, Caruso argues in part that none of her felony drug convictions (except for the conviction stemming from the July 22 incident) are younger than 10 years old and thus, should be excluded under FRE 609(b) since their probative value is not substantially outweighed by the danger of unfair prejudice.  Further, her misdemeanor convictions are not admissible under FRE 609(a).

### *Defendants' Opposition*

Defendants argue that they will not include any collateral details and circumstances attendant to Caruso's convictions.  However, the fact and length of detention is relevant.  Caruso was convicted of a felony.  Credibility is an issue in this case and under FRE 609(a)(1), the felony conviction is admissible subject to FRE 403.  Because the incident at issue occurred in a prison, the jury will know that Caruso is a prisoner.  Further, the duration of Caruso's sentence, a life sentence, is relevant to the consideration of whether Caruso would suffer any consequences from perjuring herself.

With respect to disciplinary history, Defendants indicate that they will only raise her disciplinary history if Defendant claims that she is reformed or no longer involved in drug trafficking.  What, if any, disciplinary finding will be introduced depends on what or how Caruso opens the door.  Therefore, a ruling on this matter should be deferred.

With respect to the convictions and disciplinary history of inmate witnesses, FRE 608 and 609 potentially make those matters admissible.  However, because inmate witnesses may be irrelevant if the Court grants Defendants' first MIL, Defendants request that the court defer a ruling on the admissibility of the "criminal and disciplinary" history of the inmate witnesses.

### *Discussion*

The parties do not address any specifics regarding inmate witnesses.  Without specifics, the Court cannot make a ruling.  Similarly, with respect to Caruso, no specific instances of discipline have been identified.  Without specific instances of discipline, no ruling can be made as to either Caruso or inmate witnesses and must be deferred.

With respect to Caruso's crimes, all of her felony convictions appear to be over 10 years old.  Thus, FRE 609(b) governs.  FRE 609(b) provides in relevant part that evidence of a conviction that is 10 years old (or more) is admissible "only if:  (1) its probative value, supported by specific facts and circumstances, substantially outweigh its prejudicial effect."  Caruso has multiple felony drug convictions and is under a life sentence (it is unknown whether the life sentence is with or without the possibility of parole).  Evidence of stale convictions adds some additional probative value in terms of Caruso's credibility, however, the stale felony drug crimes and life sentence are also very prejudicial.  It is true that the jury will know that she is a prisoner based on the facts of this case.  They will also know that she has been in prison for over 7 years, and thus a felon, since the incident occurred on July 22, 2013.  They will also know that Caruso pled guilty to possession of heroin in court as a result of the drugs recovered during the search (per the parties' stipulation).  In other words, the jury will know that Caruso is a convicted prisoner who has spent and is spending a significant amount of time incarcerated.  Considering the information that the parties agree will be presented to the jury in terms of Caruso's status as a prisoner, Defendants have not sufficiently shown that the various felony convictions that are all over 10 years old substantially outweigh their prejudicial effect.  Therefore, evidence of Caruso's felony criminal convictions, including her life sentence, will be excluded under FRE 609(b)(1).

With respect to any misdemeanor convictions, FRE 609(a) provides for the admission of misdemeanors if the "elements of the crime required proving – or the witness admitting – a dishonest act or false statement."  Fed. R. Evid. 609(a)(2).  Here, Defendants do not identify which particular misdemeanors are at issue.  Without identifying what the misdemeanors are, there is no indication that those convictions involve some element of dishonesty or falsity.  Therefore, Caruso's misdemeanor convictions will be excluded pursuant to FRE 609(a)(2).

Finally, for purposes of clarification, Caruso identified two possible exceptions to this motion in limine.  First, Caruso explained that the parties have reached a stipulation that the jury will be informed that she suffered a conviction as a result of the July 22, 2013 incident.  The Court will honor that stipulation, and this motion in limine will not encompass the July 22 based conviction.  Second, Caruso identifies conduct relating to a July 3 search.  Issues surrounding the

1  July 3 search will be resolved as part of Defendants' motion in limine eleven and will not be

2  encompassed by the order on this motion in limine.

3      *Ruling*

4      Caruso's third motion in limine is granted in part.  The Court reserves any rulings with

5  respect to Caruso's disciplinary history and the disciplinary history of any inmate witnesses.

6  Caruso's felony convictions that are over 10 years old are excluded under FRE 609(b)(1), and

7  Caruso's misdemeanor convictions are excluded under FRE 609(a)(2).  This ruling does not

8  implicate the agreement that the parties have reached regarding her conviction stemming from the

9  July 22 incident or the July 3 search.

10     **2.      Motion in Limine No. 5 -- Admit the Use of Force Critique By Lt. Villegas**

11     *Plaintiff's Argument*

12     Caruso argues that Lt. Villegas was present during the July 22 incident and had the

13 responsibility of preparing the incident report and Use of Force Critique.  Lt. Villegas had the

14 responsibility to review the force used and determine whether it was consistent with the use of

15 force policies.  The Use of Force Critique is relevant because it contains a finding that Caruso did

16 not present a physical threat to staff.  One of the five factors that are evaluated under the Eighth

17 Amendment excessive force claim is the threat reasonably perceived by the defendants.  Further,

18 the justification for initiating the search is one of the factors evaluated under *Bell v. Wolfish*.  The

19 fact that Lt. Villegas, a percipient witness, concluded that Caruso did not pose a threat to staff is

20 highly relevant to both claims.

21     In reply, Caruso identifies a representation in Defendants' motion in limine eight, that

22 there is no dispute that Caruso did not pose a physical threat, may make this motion unnecessary

23 in that the parties may be able to reach a stipulation to admit this fact.  If so, the Use of Force

24 Critique will be withdrawn as an exhibit.

25     *Defendants' Opposition*

26     Defendants argue that Caruso's pleadings do not indicate that Lt. Villegas was a percipient

27 witness to the incident, as he is not identified in the SAC.  Consistent with the SAC, Lt. Villegas

28 was in Building 511, but did not participate in any element of the search or handcuffing in

19

1   Caruso's cell.  Lt. Villegas was not a percipient witness.  Lt. Villegas's Use of Force Critique was

2   produced during discovery in a redacted form.  It was later produced in an unredacted form given

3   the dispute regarding Lt. Villegas's presence at the search and handcuffing of Caruso.  The Use of

4   Force Critique and any evaluation of the circumstances following this incident is improper.  Jurors

5   will not decide whether Caruso presented a physical threat to staff at the time of the incident.

6   Physical threat is merely one consideration of staff when examining the handcuffing of an inmate.

7   Any suggestion that a lack of physical threats tends to prove Caruso's excessive force claims

8   creates unfair prejudice and will confuse the jury.

9       *Discussion*

10      After review, the Court concludes that the Use of Force Critique by Lt. Villegas has only

11  rebuttal relevance.  The Use of Force Critique is two pages long (Doc. No. 252-9).  The only piece

12  of information on the document that appears to have relevance to Caruso is a single sentence on

13  Page 2 that reads:  "Inmate Caruso did not present a physical threat to staff."  See id.  Each

14  Defendant can be asked whether Caruso posed a physical threat to them.  If any Defendant

15  contends that Caruso posed a physical threat, then the Use of Force Critique may be admitted as

16  rebuttal.  The Use of Force Critique appears to be an official CDCR document that is prepared by

17  a supervisor and evaluates the use of force in relation to CDCR policy/regulation.  The fact that it

18  was determined that Caruso did not pose a physical threat to staff within the meaning of CDCR

19  policy/regulation would rebut any testimony by an individual officer that Caruso posed a physical

20  threat.  Caruso is correct that whether she posed a threat to any Defendant is an identified factor

21  for purposes of the Eighth Amendment excessive force claim.[9]  Again, to address this factor, she

22  may ask each Defendant a direct question. However, with respect to the Fourth Amendment search

23  claim, the Court is unaware of any Defendant stating that the search was justified to find a weapon

24  or because Caruso posed a physical threat to them.  Defendant Lopez testified that she saw Caruso

25  place a drug bindle in her underwear, which appears to the be basis for the resulting strip search.

26

27  [9] Five factors should generally be considered in the context of an Eighth Amendment excessive force case:  (1) the extent of injury suffered by an inmate; (2) the need for application of force; (3) the relationship between that need and the amount of force used; (4) the threat reasonably perceived by the responsible officials; and (5) any efforts made to

28  temper the severity of a forceful response.  Hudson v. McMillian, 503 U.S. 1, 7 (1992); Furnace v. Sullivan, 705 F.3d 1021, 1028-29 (9th Cir. 2013).

1      *Recommendation*

2           Caruso's fifth motion in limine is granted in part.  Caruso may admit the relevant portion

3    of Lt. Villegas's Use of Force Critique for purposes of rebuttal to any witness who claims that

4    Caruso posed a physical threat to the officers during the July 22 incident.

5           **3.       Motion in Limine No. 6 -- Exclude Character Evidence or Prior Bad Acts by**

6                   **Caruso**

7           *Plaintiff's Argument*

8           Caruso argues that Defendants will seek to bias jurors against her with improper character

9    evidence, including her participation in drug distribution in prison.  However, evidence of drug

10   distribution is irrelevant to her Fourth Amendment search and Eighth Amendment excessive force

11   claims.  Defendants had never met Caruso before the July 22 incident and did know about her

12   criminal or prison disciplinary history prior to July 22.  Because Defendants did not know about

13   Caruso's disciplinary record, their actions could not have been influenced by that record.

14   Defendant's expert Watkins did not even review her disciplinary history.  Although some ISU

15   staff had heard about Caruso being involved in drug trafficking prior to July 22 from staff and

16   Caruso's former prison, there is no evidence that this information influenced in any way the

17   Defendants' actions in searching or handcuffing Caruso.  In fact, Caruso was not under

18   investigation at the time of the July 22 incident.  Further, any probative value that may be derived

19   from drug trafficking activities would be cumulative to the undisputed facts regarding Caruso's

20   possession of drugs.  The parties do not dispute that Caruso was in possession of drugs and agree

21   that the jury should be informed that Caruso was in possession of heroin and meth, as well as the

22   evidence regarding the quantity of drugs.  The parties also agree that the jury should be informed

23   that Caruso pled guilty in state court to possession of meth.  Further, evidence of Caruso's drug

24   dealing activities would be unfairly prejudicial to Caruso under FRE 403.  Caruso's intent for the

25   drugs has no probative value to any issue in the case and would unfairly associate Caruso with

26   violent tendencies in the eyes of the jury.  Finally, evidence of drug trafficking activity is improper

27   character evidence under FRE 404.

28

*Defendants' Opposition*

Evidence concerning Caruso's drug distribution and drug trafficking served as the basis for Defendants' actions.  Lopez testified that Caruso was under investigation and suspected of possessing narcotics as of the date of the incident.  Lopez noted that it is common for ISU to receive a tip that an inmate possess drugs, and Caruso was on a monitored list of inmates who were suspected of using or selling drugs.  This information, which was in Defendants' possession on the day of the incident, details the threat that Caruso posed to herself and others at the prison.  This information informs the jury about the need to thwart Caruso's behavior and the motives for Defendants' actions.  Caruso's history of drug trafficking is relevant to her knowledge of "prison politics," her obligations to deliver the drugs to inmates, and the consequences of not delivering the drugs.  Caruso admitted that the drugs were a means to pay back the debts she had in the prison.  The information also explains why Caruso attempted to avoid the Defendants' search and confiscation of the drugs.  Jurors need this information to assess the basis for Defendants' actions and determine whether the perceived emergency was credible.  Consistent with Rule 404(b), Defendants intend to offer evidence of Caruso's drug trafficking to demonstrate Caruso's knowledge, intent, opportunity, preparation, plan, and motive to deceive law enforcement and distribute drugs.  Drug-trafficking evidence demonstrates Caruso's intention to evade Defendants' search, her willingness to defy orders, and her incentive for doing so.

*Discussion*

Defendants may testify about why they raided Caruso's cell.  They may also testify about any information that they had in their possession prior to the raid on July 22.  However, there is no indication that any Defendants were aware of Caruso's drug trafficking activities in prison.  If no Defendant was aware of Caruso's prior prison drug tracking activities, then that evidence could play no role in the justification for either the search or the handcuffing of Caruso.  Caruso's drug trafficking activities would have no relevance under FRE 401 and would be confusing and substantially prejudicial under FRE 403.

In terms of FRE 404(b), the Court is not satisfied that a sufficient FRE 404(b) purpose has been established.  Caruso is not disputing that she had drugs, and information presented during the

summary judgment process indicate that Caruso even offered to retrieve the drugs from her body during the July 22 cell raid.  To the extent that there is a permissible FRE 404(b) purpose, what little probative value that may exist is substantially outweighed by the danger of confusion and unfair prejudice under FRE 403.

### Ruling

Caruso's sixth motion in limine is granted and evidence regarding Caruso's prior prison drug trafficking activity is excluded pursuant to FRE 403.  However, Defendants may testify to any information about Caruso that was in their possession prior to the July 22, 2013 incident.

## VI.   Defendants' Motions in Limine

### 1.   Motion in Limine No. 2 - Preclude Evidence or Argument About Dismissed Claims

### Defendants' Argument

Defendants argue that, following summary judgment, the only remaining claims in this case involve a Fourth Amendment search for the drug bindle and an Eighth Amendment excessive force claim based on handcuffing.  Any evidence or argument concerning the dismissed Eighth Amendment sexual assault and unreasonable search claims, or the Fourth Amendment excessive force and unreasonable search for a cell phone claims, should be precluded as irrelevant.

### Plaintiff's Opposition

Caruso agrees that it is appropriate to grant this motion to the extent that it seeks to exclude the fact that a claim was dismissed.  Such information would be confusing to the jury under FRE 403.  However, as framed, the MIL is too broad because it would exclude evidence that is relevant to both existing and dismissed claims.

### Discussion

The Court agrees that evidence or arguments relating to a dismissed claim is not relevant.  However, Caruso's point is also valid in that some evidence may be relevant to both dismissed and remaining claims.  The proper course is to exclude the fact that a claim was brought and dismissed and exclude evidence that is only relevant to a dismissed claim.  Evidence that has relevance to

1  both a dismissed claim and a remaining claim is admissible.  More specific rulings will have to be

2  made during the course of the trial as the evidence is introduced and relevance (or lack thereof)

3  becomes clearer.  In the face of an objection at trial based on the ruling of this motion, Caruso will

4  be required to explain how the evidence at issue has relevance apart from any dismissed claim.

5      *Ruling*

6      Defendants' second motion in limine is granted in part.  Caruso is precluded from making

7  any arguments regarding dismissed claims and from presenting evidence that has relevance only to

8  dismissed claims.  Evidence that has sufficient relevance to both dismissed and remaining claims

9  will be admissible (subject to any other evidentiary objections that may apply).

10      **2.**    **Motion in Limine No. 3 - Preclude Evidence or Arguments Concerning**

11          **Alleged Retaliation Through Rescission of Plaintiff's "Cuff In Front" Chrono**

12      *Defendants' Argument*

13      Defendants argue that there is not a retaliation or conspiracy claim in this case, yet they

14  intend to introduce evidence that non-party Dr. Romero rescinded Caruso's cuff in front chrono

15  within days of the incident in part because of direction from custody staff/Defendants.  However,

16  there is no evidence that any Defendant instructed Dr. Romero to take this action.  Extensive

17  deposition testimony did not reveal a link between Dr. Romero and the Defendants.  Further, in

18  reply, Defendants emphasize that Dr. Romero confirmed that she used her medical judgment and

19  prior medical notes to rescind the chrono.

20      *Plaintiff's Opposition*

21      Caruso argues that the MIL should be denied for several reasons.  As background, Caruso

22  explains that on the date of the Incident, ISU staff (Solorio) pulled Nurse Franco aside and met

23  privately with him about Caruso before he examined her.  During his evaluation of Caruso, Caruso

24  told Nurse Franco about the cuff in front chrono, but Franco said that he had nothing to do with

25  that and he was there only to do the 7219 (a form relevant to Ad Seg placement) and leave.

26  Franco told Caruso that she would need a separate medical appointment to discuss the chrono or

27  other issues.  The accuracy of Franco's documentation of Caruso's injuries is disputed.  Two days

28  after the Incident, on July 24, 2013, Dr. Romero removed Caruso from the Disability Placement

1    Program ("DPP") and rescinded nearly all of Caruso's medical accommodations, including the

2    cuff in front chrono.  In 15 years of experience, Romero could not think of another person who

3    had been involuntarily removed from the DPP and had no explanation for what prompted Caruso's

4    removal from the DPP.  However, the documentation has a box checked that indicates Caruso was

5    removed from the DPP based on "observation by staff."  Dr. Romero could not identify which

6    staff alerted her to the need to remove Caruso from the DPP.  Dr. Romero also removed chronos

7    for a TENS unit, wheelchair, grab rails, a cane, a ground floor cell, a special shoes, which Caruso

8    had required for several years prior.  Romero acknowledged that a physical exam of the prisoner is

9    ordinarily conducted prior to rescinding an accommodation.  Romero claimed that she observed

10   Caruso in Ad Seg on July 24, 2013  prior to rescinding the accommodations.  In her 15 years of

11   experience, Romero testified that she almost always evaluated patients at the medical clinic and

12   had never before done an evaluation in Ad Seg.

13         Caruso argues that rescission of her medical chrono is relevant to her damages and the

14   extent of her pain and suffering.  Caruso should be able to explain how her physical pain was

15   aggravated by the involuntary removal of her medical accommodations.  The rescinded chronos

16   explain the extent of Caruso's pain and suffering.

17         Caruso also argues that Defendants can be held liable for the aggravated pain and

18   suffering caused by the rescinded chronos because there is sufficient evidence from which a

19   reasonable jury could infer that the sudden reversal of her medical accommodations was put into

20   motion by Defendants' wrongful acts.  Just two days elapsed from the Defendants' participation in

21   the July 22 incident to the July 24 rescission.  When Caruso tried to speak to Franco about the

22   medical chrono, Franco responded that he was told to complete a medical form and that she would

23   need to make a separate appointment about the chronos.  Prior to talking to Caruso, Franco spoke

24   to Defendant Solorio.  Further, Dr. Romero testified that the medical action was taken against

25   Caruso based on an observation by staff, but she could not identify which staff.  Further, Dr.

26   Romero's testimony shows that the chronos were rescinded under very unusual circumstances.

27   The evidence is sufficient for a jury to infer that "ISU staff" participated in the sudden removal of

28   Caruso's medical accommodations or at the very least were a moving force behind the rescission.

1        Finally, Defendants argue that Dr. Romero was recently listed by Defendant as a percipient

2   witness.  Presumably Defendants will attempt to show that Dr. Romero conducted a medical

3   evaluation of Caruso within two days of July 22 and did not find significant injuries.  To rebut Dr.

4   Romero, Caruso is entitled to show that Dr. Romero's medical evaluation was conducted for the

5   purpose of conducting a neutral evaluation of Caruso's injuries, but for the ill purpose of

6   rescinding her medical accommodations and removing her from the disability program.

7        *Discussion*

8        In the summary judgment order, the Court noted that Dr. Romero rescinded Caruso's cuff-

9   in-front chrono shortly after the incident.  The Court explained that the rescission was irrelevant

10  because nothing linked that action by Dr. Romero to any Defendant.  Now, Caruso has identified

11  three bases for providing information regarding all of her rescinded chronos/accommodations.

12       First, Caruso argues that the rescinded chronos/accommodations show the extent of her

13  injuries.  That is false.  The fact of rescission does not show that Caruso suffered greater injuries

14  from the acts of Defendants, and rescission itself does not provide any reasonable measure of pain

15  and suffering.  While it is possible that the absence of a chrono/accommodation may have made

16  Caruso's injuries worse, no evidence regarding the rescission is necessary.  Caruso herself may

17  testify about her symptoms/pain and then explain how certain daily activities affected her.  She

18  does not need to show that the absence of an accommodation exacerbated her pain, she need only

19  testify that regular daily activities (irrespective of the accommodations) caused her to experience

20  pain.

21       Second, Caruso argues that the Defendants could be liable for any injury or aggravation of

22  an injury that was caused by a rescission.  However, Dr. Romero testified that she rescinded the

23  various chronos/accommodations based on her own medical judgment, even if what prompted her

24  review was observations from other unknown prison staff.  It remains the case that there is no

25  evidence that links any Defendant to Dr. Romero.  Simply saying that "ISU Staff" likely

26  influenced Dr. Romero is not the same as saying a particular Defendant or all Defendants did so.

27  Caruso is merely speculating that some Defendant(s) caused Dr. Romero to improperly rescind the

28  chrono.  Without some kind of affirmative link between Dr. Romero's actions and a Defendant (as

1  opposed to unknown and unnamed "ISU staff"), rescission of the chronos by Dr. Romero does not
2  support any kind of liability against any Defendant.

3        Finally, Caruso argues that evidence of rescission is needed to rebut Dr. Romero's likely
4  testimony.  If Dr. Romero is even called, and if she testifies that she evaluated Caruso and saw no
5  significant injuries, it is unclear how evidence of the rescissions rebuts much.  If Dr. Romero
6  testifies that she conducted an evaluation, then the nature and purpose of the evaluation is fair
7  game.  That is because it does not appear that Dr. Romero "evaluated" Caruso for the purpose of
8  assessing whether she suffered any injuries at the hands of Defendant, rather, it was an evaluation
9  based on visual observation for purposes of assessing the need for the various
10  chronos/accommodations.  In other words, two different purposes are involved.  However,
11  explaining the extent and reason for observations does not mean that evidence that a rescission
12  occurred is admissible.  Nor does it mean that all of the evidence outlined by Caruso surrounding
13  the rescission or the reasons that prompted Romero to conduct an evaluation are admissible.  All
14  of Caruso's extra evidence regarding the rescission is of limited relevance and it is substantially
15  outweighed by the danger of jury confusion and the undue consumption of time (there is a clear
16  danger of a mini trial erupting over this issue at trial) under FRE 403.

17        *Ruling*

18        Defendants' third motion in limine is granted.  However, depending on the testimony of
19  Dr. Romero (if any), the nature of any examination she conducted of Caruso and the reason why
20  Dr. Romero conducted the examination is relevant and admissible.  Otherwise, evidence of an
21  actual rescission of any chrono/accommodation or the events that led Dr. Romero to conduct an
22  evaluation is excluded under FRE 401 and FRE 403 as being unduly prejudicial, confusing,
23  misleading, and  unduly time consuming relative to the limited probative value of such evidence.

24      **3.**    **Motion in Limine No. 10 -- Limit the Testimony of Non-Retained Experts**
25          **Celosse and Pulling**

26        *Defendants' Argument*

27        Defendants argue that Caruso will attempt to introduce the testimony of non-retained
28  experts Celosse and Pulling to prove that she sustained an injury during the July 22, 2013 incident.

Because their treatment of Caruso did not begin until 2017, and they did not produce any expert

reports, their testimony should be limited to opinions formed during their examination and

treatment of Caruso.

### *Plaintiff's Opposition*

Caruso agrees that, as non-retained experts, treating psychologists Drs. Celosse and Pulling

are limited in their ability to present expert opinions that were formed outside the scope of their

treatment.  However, these doctors were not provided with any documents that had not been

reviewed during the course of treatment.  Caruso does not oppose limiting their testimony

consistent with Ninth Circuit precedent.  They are percipient witnesses to the treatment rendered,

and the scope of their opinions is limited to those that they formed in the course of their treatment

of Caruso, including opinions on diagnoses and causation.

### *Discussion*

Treating physicians are a species of percipient witness who were hired to provide

treatment, not to testify.  Goodman v. Staples the Office Superstore, LLC, 644 F.3d 817, 819 (9th

Cir. 2011).  A non-treating physician is not subject to Rule 26(a)(2)'s requirement of a written

report so long as the physician does not morph into a hired witness by going beyond the usual

scope of a treating physician's testimony.  Id. at 819-20.  This Court has addressed this issue

before.  In *Holcomb v. Ramar*, the Court explained in general that:

> "[A] treating physician is only exempt from Rule 26(a)(2)(B)'s written report
> requirement to the extent that his opinions were formed during the course of
> treatment." Goodman v. Staples the Office Superstore, LLC, 644 F.3d 817, 826
> (9th Cir. 2011); see also Fielden v. CSX Transp., Inc., 482 F.3d 866, 871 (6th Cir.
> 2007) ("[A] report is not required when a treating physician testifies within a
> permissive core on issues pertaining to treatment, based on what he or she learned
> through actual treatment and from the plaintiff's records up to and including that
> treatment."). **Under this rule, as long as the opinions were formed during the
> course of treatment, a physician need not submit the detailed Rule 26(a)(2)(B)
> report and may offer opinions relating to the plaintiff's appearance and
> condition from the start to the end of treatment, the extent of the plaintiff's
> disability, the treating physician's treatment of the plaintiff, the treating
> physician's assessment of plaintiff's condition during and at the conclusion of
> treatment, the plaintiff's prognosis, causation, and the need for future
> treatment.** See Alfaro v. D. Las Vegas, Inc., 2016 U.S. Dist. LEXIS 113949, *36-
> *37 (D. Nev. Aug. 24, 2016); Israeli v. Ruiz, 2015 U.S. Dist. LEXIS 97650, *10-
> *11 (S.D. N.Y. July 27, 2015). Opinions that were not formed during the course of
> treatment, including opinions that were formed after viewing "outside materials,"
> must be presented in a detailed Rule 26(a)(2)(B) report. See Goodman, 644 F.3d at

826; Fielden, 482 F.3d at 871. The use of "hypotheticals" is generally inappropriate with respect to the opinions of a treating physician. Cisson v. C. R. Bard, Inc. (In re C. R. Bard, Inc.), 948 F. Supp. 2d 589, 615 & n.3 (S.D. W. Va. 2013); Whitley v. Yarber, 2013 U.S. Dist. LEXIS 186430, *11-*12 (N.D. Ga. 2013).

Holcomb v. Ramar, 2017 U.S. Dist. LEXIS 106355, *3-*4 (E.D. Cal. July 10, 2017) (emphasis added).  There is no dispute that Drs. Celosse and Pulling are treating physicians who have not provided a detailed Rule 26(a)(2) report.  Therefore, the limitations that were imposed in *Holcomb* will apply to limit the scope of Drs. Celosse and Pulling's testimony.

*Ruling*

Defendants' tenth motion in limine is granted.  Consistent with *Holcomb*, Drs. Pulling and Celosse may offer opinions that were formed during the course of treatment, including opinions relating to Caruso's appearance and condition from the start to the end of treatment, the extent of the Caruso's disability (if any), the treating physician's treatment of Caruso, the treating physician's assessment of Caruso's condition during and at the conclusion of treatment, the Caruso's prognosis, causation, and the need for future treatment.

4.  **Motion in Limine No. 5 -- Preclude Plaintiff from Offering Opinions or Inferences or Arguments about the Nature or Extent of Her Alleged Injuries and Issues of Medical Causation**

*Defendants' Argument*

Opinions of medical diagnosis, causation, and prognosis can only be rendered by a qualified expert.  Defendants argue that they believe Caruso will try to testify and introduce medical records that demonstrate that an acute injury was sustained during the July 2012 incident, resulting in a second spinal surgery in 2017.  However, Plaintiff lacks the expertise to offer opinions or inferences as to the nature and extent of her any injuries (if any) caused by Defendants in July 2013.  Caruso did not disclose an expert witness regarding any physical damages that were sustained because of the incident.  Further, Caruso had a pre-existing condition, which gives rise to the need to apportion the extent to which the pre-existing condition was aggravated by Defendants, if at all.  No expert has been retained that can apportion.  Further, any statements that

1   Caruso seeks to introduce about what a doctor told her is hearsay.  While Caruso can testify about

2   what she experienced or felt following the incident, testimony regarding formal diagnoses,

3   medical opinions, inferences or medical causation should be precluded.  Because Caruso has no

4   medical experts who are qualified to testify regarding spinal/back and neck conditions/injuries, no

5   witness should be permitted to provide testimony regarding medical records, medical conditions,

6   or alleged injuries caused by Defendants at the incident.

7         *Plaintiff's Opposition*

8         Caruso argues that she agrees that neither she nor her prisoner percipient witnesses may

9   testify in a manner that requires expert testimony.  However, they may testify as to what they saw

10  and offer lay opinions about Caruso's physical and mental state under FRE 701.  The Ninth

11  Circuit has recognized that a lay witness may testify about another's pain and suffering as long as

12  it is based on their own perceptions and observations.  As long as no specialized expertise is

13  required to draw causal inferences, a lay witness may give opinions that are based on a process of

14  reasoning that is familiar in everyday life.  Further, Caruso argues that her non-retained expert

15  psychologists may testify about diagnoses, causation, and prognosis that were formed during their

16  treatment of Caruso.  Finally, as a lay witness, Caruso argues that she can give testimony about

17  what she felt and experienced, the extent of her injuries, and her pain and functioning both before

18  and after the incident, and she may also testify as to what she communicated to medical personnel,

19  what she did in response to her physical and psychological symptoms, how her injuries have

20  affected her life, and any medical treatment that she personally observed.  Caruso agrees that she

21  cannot give specific medical diagnoses or prognoses.  But she can opine as to how she thinks her

22  injuries were caused based on her direct perception of pain and functioning both before and after

23  the incident, and she may testify that her preexisting conditions were worse after the incident

24  based on her own perceptions and observations.  To the extent that Defendants' motion seeks to

25  exclude the above testimony, it is over broad.

26        *Discussion*

27        Initially, there is no dispute that Caruso can testify regarding her "symptoms," i.e. what she

28  felt and experienced during and after the incident.  She also can testify about what she had been

1  feeling and experiencing before the Incident.  There is also no dispute that Caruso cannot give

2  formal medical testimony regarding formal diagnoses or prognoses.

3       Apart from the above, the Court agrees with Caruso.  Caruso may testify about what she

4  told medical personnel pursuant to FRE 803(4), how she behaved, what she did following the

5  incident, and how she functioned.  Other lay witnesses can testify as to what they saw, how

6  Caruso appeared, and opine about Caruso's apparent pain or anguish as lay opinions under FRE

7  701.  Caruso's mental and physical pain are at issue, and no specialized knowledge or experience

8  is necessary to opine about whether a person appears to be experiencing pain or how much pain a

9  person may be suffering.  Experiencing pain and observing other experiencing pain are regrettably

10 a regular part of life.[10]

11      *Ruling*

12      Defendants' fifth motion in limine is granted in part and denied in part.  No lay witness

13 may testify or offer opinions regarding formal medical diagnoses, medical prognoses, or medical

14 causation.  Caruso may testify about her own experiences, observations, actions, symptoms, as

15 well as her own communications to medical personnel (consistent with FRE 804(a)(4)).  Lay

16 witnesses may offer lay opinions regarding Caruso's physical or mental pain if Caruso lays the

17 appropriate foundation under FRE 701.

18  **5.    Motion in Limine No. 4 -- Preclude Introduction of Plaintiff's Medical**

19  **Records into Evidence or Providing Testimony about Her Medical Conditions**

20  **Through Unqualified Witnesses**

21      *Defendant's Argument*

22      Defendants argue that neither Caruso nor other lay witnesses should be permitted to

23 introduce evidence contained in her medical records or concerning her medical condition absent

24 testimony from a qualified medical expert.  Caruso seeks to introduce medical records concerning

25 complaints and treatment after the July 22, 2013 incident without a medical expert, including

26 records of a second spine surgery.  These records contain technical opinions and are confusing and

27

28 [10] To the extent that a non-retained medical expert intends to opine about Caruso's mental or physical pain, the
   Court's ruling under Defendants' motion in limine ten applies.

irrelevant without an expert who can opine that the records reflect injury/damage from the incident.  Further, Caruso should be precluded form eliciting testimony concerning her medical condition or physical injuries by mental health experts, such as Drs. Pulling and Karin Celosse, when there is no indication that mental health experts typically rely on such medical records in forming opinions concerning their patient's mental health care.

### Plaintiff's Opposition

Caruso argues that her prior diagnosis of spinal stenosis and her prior spinal surgery was documented in medical records related to the July 22, 2013 incident.  Both Nurse Franco (who did a medical evaluation on July 22) and Dr. Romero (who rescinded Caruso's chrono and accommodations two days later on July 24) can testify as to the pre-existing condition because it was noted and considered by both of them in the course of medically evaluating Caruso in July 2013.  Additionally, treating physicians Drs. Pulling and Celosse can testify about opinions formed during the course of their mental health treatment of Caruso.  These doctors may testify about the post-July 2013 diagnosis of PTSD on-setting on July 22, 2013.  Caruso states that Drs. Pulling and Celosse will not offer testimony regarding medical conditions relating to her spinal injuries.  Caruso also argues that she herself and other prisoner witnesses may offer lay opinions about Caruso's injuries under FRE 701.  Caruso agrees that she cannot provide testimony about any medical record or interpret or explain her medical records.

### Discussion

The focus of the motion in limine is Caruso's medical records.  Caruso agrees that she herself cannot discuss or interpret her medical records.  She does indicate that any treating physician/medical personnel can explain a treatment record they created or a record they relied upon in the course of treatment.  The Court agrees.  There are four medical providers who can testify about what they observed and what they considered, including any medical records they reviewed or generated, in evaluating or treating Caruso.  Other than Drs. Pulling, Celosse, Romero and Nurse Franco, there is no one witness who appears to be competent to discuss or admit medical records.  Therefore, unless one of these medical professionals is discussing a record, no other witness will be permitted to discuss Caruso's medical records.

*Ruling*

Defendants' fourth motion in limine is granted.  However, Drs. Pulling, Celosse, Romero and Nurse Franco may testify as to what they observed and what they considered, including any medical records they reviewed or generated, in evaluating and/or treating Caruso.  If appropriate, a medical record or part thereof could then be introduced in connection with that testimony.

**6.      Motion in Limine 6 -- Preclude Evidence or Argument Concerning**
**Disciplinary Action Against Defendants or Non-Defendant Staff**

*Defendants' Motion*

Defendants argue that there is no evidence of discipline against them as a result of the July 22, 2013 incident, and any discipline that existed before or after the incident is irrelevant, misleading, and unduly prejudicial.  Further, Caruso intends to introduce evidence of discipline against non-parties Officer Bates and Nurse Franco.  The discipline against Bates involves something that occurred after July 22 and Bates did not author an incident report in this case.  The discipline is irrelevant and contrary to several state law privileges involving peace officers' personnel records and a conditional public interest privilege, as well as the federal official information privilege.  Similarly, the discipline against Nurse Franco occurred years after the incident.  It is irrelevant, confusing, and unduly prejudicial.

*Plaintiff's Opposition*

Caruso argues that the disciplinary action against Nurse Franco and Officer Bates are admissible.  With respect to Nurse Franco, in July 2018, the California Board of Registered Nursing filed an accusation against Franco seeking disciplinary action for gross negligence, incompetence, and unprofessional conduct regarding his care of a CCWF prisoner in 2016.  Among numerous allegations, the accusation alleged that Franco failed to provide accurate and complete charting and failed to comply with proper documentation standards.  At his March 12, 2019 deposition, Franco refused to answer questions about accusation against his license, based on counsel's claim that it was a personal matter.  However, on March 21, 2019, Franco agreed to a stipulated settlement and disciplinary order in which his license was revoked, but the revocation was stayed, and 3 years of probation was imposed.  Here, Nurse Franco's documentation of

1   Caruso's injuries and medical condition on the date of the incident is widely disputed.  Although

2   Franco documented some of Caruso's physical injuries that day, including neck and back pain, he

3   failed to document the full extent of her injuries and failed to validate or ensure compliance with

4   her cuff in front chrono.  "Evidence that RN Franco's nursing license was subsequently revoked is

5   relevant to show that Ms. Caruso suffered physical injuries that were not appropriately

6   documented by the nurse."  Doc. No. 266 at 4:14-15.  This evidence is relevant to damages and is

7   highly probative given the absence of medical experts on the issue of damages.  The evidence is

8   not offered to prove character, but to show intent, motive, or absence of mistake in the nurse's

9   failure to document the full extent of Caruso's injuries and her complaints of regarding the

10  Defendants' refusal to comply with cuff in front chrono.

11      With respect to Officer Bates, Lt. Villegas and Defendant Ingram testified that Bates was

12  removed from the ISU due to dishonesty, although the dishonesty was not related to the July 22

13  incident.  At her deposition, Bates testified untruthfully that she left the ISU voluntarily.  To the

14  extent that Bates testifies that she left ISU voluntarily, then evidence of her involuntary dismissal

15  is admissible under FRE 608(b).  If Bates admits that she was involuntarily removed, her prior

16  testimony that she voluntarily left ISU is admissible under FRE 613.  To the extent that Bates's

17  trial testimony requires impeachment, evidence regarding her removal from ISU is admissible for

18  impeachment purposes.  Further, aside from whether state law privileges apply in federal court,

19  defense counsel made no objections during the depositions of Lt. Villegas or Sgt. Ingram when the

20  disciplinary action was revealed.  Thus, the belated *Pitchess* objections have been waived.

21      *Discussion*

22      Initially, there is no discussion or reply from Caruso regarding discipline against any

23  Defendant.  Thus, there is no indication that any discipline against any Defendant is relevance.

24  Under FRE 401 and 403, any discipline against a Defendant will be excluded as irrelevant or

25  confusing and unfairly prejudicial.

26      With respect to Franco, the Court finds that the suspension of his nursing license by the

27  California regulatory board is inadmissible for two reasons.  First, Caruso admits that she wants to

28  use the suspension/nature of the suspension to show that Franco did not accurately document her

1  injuries.  That is a forbidden FRE 404(b) purpose – evidence of a bad act to show action in
2  conformity with that bad act on a particular occasion.  See FRE 404(b)(1).  In terms of permissible
3  FRE 404(b) purposes, none of the enumerated FRE 404(b) permissible purposes appear applicable
4  to Franco.  Moreover, even if there is an arguable permissible FRE 404(b) purpose, the
5  circumstances of this case are not comparable to the circumstances that led to the probationary
6  suspension of Franco's license.  In Franco's case, he performed inaccurate and incompetent
7  documentation on a single inmate over a four day period, during which time the inmate continued
8  to deteriorate and ultimately was hospitalized for septic shock.  See Doc. No. 274-16.  That is not
9  similar to this case.

10       Second, there are significant FRE 403 problems.  The Court has no doubt that a mini-trial
11  would result concerning the circumstances surrounding Franco's suspension, since Defendants
12  would surely delve into the specifics of the suspension to show that this case and the suspension
13  are different.  There is also a significant risk of confusion that would go hand in hand with the
14  undue consumption of time.  Any probative value that the suspension may have is substantially
15  outweighed by the dangers of undue time consumption and confusion under FRE 403.

16       In sum, pursuant to FRE 403 and 404(b), the discipline of Nurse Franco/the suspension of
17  his nursing license will be excluded.

18       With respect to Bates, "[t]estimony about a witness's credibility is prohibited unless it is
19  admissible as character evidence."  See United States v. Sanchez-Lima, 161 F.3d 545, 548 (9th
20  Cir. 1998).  Under FRE 608(a), witnesses can give an opinion about a witness's reputation for
21  truthfulness or untruthfulness.  See Fed. R. Civ. P. 608(a).  Thus, other witnesses (primarily
22  Ingram and Villegas) can be asked about Bates' reputation for truthfulness.  Also, FRE 608(b)
23  "allows a cross-examiner to impeach a witness by asking him about specific instances of past
24  conduct, other than crimes covered by [FRE] 609, which are probative of his veracity or 'character
25  for truthfulness or untruthfulness.'  The Rule limits the inquiry to cross-examination of the
26  witness, however, and prohibits the cross-examiner from introducing extrinsic evidence of the
27  witness' past conduct."  United States v. Abel, 469 U.S. 45, 55 (1984) (discussing FRE 608(b)).
28  This rule generally envisions "did you know" or "have you heard" questions.  United States v.

1   Shelton, 514 F.3d 433, 445 (5th Cir. 2008). Bates's removal for "dishonesty," as testified to by

2   Ingram and Villegas, is 608(b) material and thus, can be the source of FRE 608(b) questions. Of

3   course, extrinsic evidence will not be permitted to prove Bates's removal for dishonesty. Further,

4   if Bates testifies at trial that she was removed from the ISU unit for dishonesty, then Bates can be

5   asked pursuant to FRE 613(b) (extrinsic evidence of prior inconsistent statement) about her

6   deposition testimony in which she did not say she was removed for dishonesty.

7         In terms of FRE 403, Bates's removal for dishonesty is something that is relevant to her

8   veracity. Bates appears to be a relatively minor witness. Permitting lengthy exploration of the

9   circumstances surrounding her removal would be unduly time consuming and confusing under

10  FRE 403. Specifics about the removal need not be discussed or explored, rather, limited questions

11  under FRE 608(b) and 613(b) can be posed without crossing the line to exclusion under FRE 403.

12        With respect to the state law privileges cited by Defendants (generally Cal. Pen. Code §

13  832.7), those privileges are not part of the Federal Rules of Evidence. That does not mean that the

14  privileges should be ignored. However, the privileges invoked involve "files." Bates's personnel

15  files and other documents are not at issue and will not be presented to the jury in any way.

16  Limiting the questions to her general removal (e.g. "You were removed from ISU for dishonesty,

17  correct?") without permitting specifics or lengthy testimony, strikes the appropriate balance

18  between the Federal Rules of Evidence any state law privileges that may be applicable or worthy

19  of consideration in state court.

20        Finally, as for the federal official information privilege, there is not a sufficient attempt to

21  apply that privilege in this case. To determine whether the federal common law qualified privilege

22  for official information applies, "courts must weigh the potential benefits of disclosure against the

23  potential disadvantages." Sanchez v. City of Santa Ana, 936 F.2d 1027, 1033-34 (9th Cir. 1990);

24  see also Moore v. Lankford, 2020 U.S. Dist. LEXIS 197182, *15 (S.D. Cal. Oct. 22, 2020)

25  ("weighs the potential benefits of disclosure against the disadvantages of chilling a government

26  agency's ability to do its job."). Defendants do not explain how the potential disadvantages of

27  asking Bates about being removed for dishonesty outweigh the benefit of the jury having evidence

28  that weighs on her veracity. As long as great detail is not disclosed, the benefits of disclosure

1  outweigh any unknown disadvantages.  CDCR and individual units within CDCR will continue to

2  review and evaluate its personnel, and if one is found to be dishonest to his or her supervisors or

3  coworkers or in the execution of their duties, that person will be removed from a team irrespective

4  of this motion or Bates's testimony.

5  *Ruling*

6  Defendants' sixth motion in limine is granted in part and denied in part.  Evidence

7  concerning the suspension of Nurse Franco's nursing licensing is excluded under FRE 403.

8  Limited questions consistent with FRE 608 and FRE 613 regarding the removal of Officer Bates

9  from the ISU for "dishonesty" will be permitted.  All other questions or evidence regarding

10  Officer Bates's removal from ISU will be excluded under FRE 403.

11  **7.**      **Motion in Limine No. 8 -- Preclude Evidence Concerning COMPSTAT Data**

12            **or Ancillary Complaints**

13  *Defendants' Argument*

14  Defendants argue that Caruso intends to offer COMPSTAT Statistical Reports, which are

15  compiled by CDCR, concerning the presence of weaponry and violence at male institutions versus

16  female institutions.  Caruso will argue that the evidence is relevant to demonstrate that

17  Defendants' application of force was unnecessary.  But it is undisputed that Caruso did not present

18  a physical threat, nor was a weapon found in her possession.  Force was applied to compel

19  obedience to a lawful order and to overcome resistance.  Any evidence on propensity for violence

20  or presence of weaponry in the prison is irrelevant.

21  Also, Caruso intends to offer evidence about her grievance efforts outside of CDCR,

22  including letters to law firms and the California Inspector General.  However, that evidence is

23  irrelevant, confusing, and prejudicial, and did not result in any adverse findings against

24  Defendants.

25  *Plaintiff's Opposition*

26  Caruso argues that the COMPSTAT report is issued by CDCR on its website and is

27  legislatively mandated.  The COMPSTAT report shows that there is a dramatic difference between

28  prisoner possession of dangerous weapons in men's prisons compared to women's prisons.  The

COMPSTAT report is relevant to help rebut defense expert Watkins's opinion that Caruso may have had a dangerous weapon in her possession.  Watkins worked for 20 years in a men's high security prison.  Watkins admitted that he did not know or review the COMPSTAT report for CCWF, but if he had reviewed that information, it may have tainted his opinion as to whether the Defendants violated polices in the search of Caruso.

Caruso also argues that her complaint to the Inspector General, as well as a complaint to a non-profit (Justice Now) by fellow inmate Schachie Day regarding the incident, are relevant to Caruso's damages.  Day submitted her complaint because she was traumatized by the incident. Caruso's October 2014 complaint to the Inspector General states that she continues to suffer mental distress.  Both of these complaints are evidence of Caruso's damages.  Caruso states that she does not intend to introduce evidence of any investigations or conclusions reached by either the Inspector General or Justice Now.

*Discussion*

There are three pieces of evidence that are at issue.  First, the COMPSTAT stats may be relevant to challenging Watkins's opinions.  Watkins did not review the COMPSTAT figures for CCWF, but Caruso's former expert Woodford did.  Watkins testified that the same policies apply in all correctional institutions in California, irrespective of COMPSTAT figures, but that the COMPSTAT figures may sway an opinion.  "The relative weakness or strength of the factual underpinnings of the expert's opinion goes to weight and credibility, rather than admissibility." Bergen v. F/V St. Patrick, 816 F.2d 1345, 1352 n.5 (9th Cir. 1987) (citation omitted).  The information that an expert chooses to review or not review are generally fair-game for cross-examination, so long as the materials have some reasonable relationship to the opinion at issue. Therefore, the COMPSTAT figures can be used to challenge Watkins's opinions.  Given the apparent nature of the COMPSTAT figures, however, those figures would be unduly confusing and unhelpful to a jury outside of the context of an expert opinion or expert explanation. Accordingly, the COMPSTAT data is conditionally admissible depending on what exactly Watkins says at trial.  Further, not all stats in the COMPSTAT would be relevant.  Caruso should only question Watkins on the relevant stats that actually undercut or challenge his opinions.

1   Second, the complaint by inmate Schachie Day is not relevant to Caruso's damages.  If

2 Day was a percipient witness, she can testify as to what she saw or heard.  She may also offer lay

3 opinions if a proper foundation under FRE 701 is laid.  However, Day's individual trauma and

4 distress are uniquely her own.  That Day suffered some kind of trauma does not mean that Caruso

5 suffered the same or even comparable trauma.  Day's complaint to Justice Now is unduly

6 prejudicial and confusing and thus, will be excluded under FRE 401 and FRE 403.

7   Third, because Caruso can testify to the mental distress that she suffered herself.  Her letter

8 to the Inspector General is unnecessarily cumulative and will be excluded under FRE 403.

9   *Ruling*

10   Defendants' eighth motion in limine is granted in part and denied in part.  Caruso may

11 cross-examine Watkins using COMPSTAT figures, but only if specific figures actually rebut or

12 undercut an opinion that he testifies to at trial.  Evidence concerning Schachie Day's letter to

13 Justice Now and Caruso's letter to the inspector general are excluded under FRE 401 and 403.

14   **8.**   **Motion in Limine No. 9 -- Preclude Evidence or Argument Concerning**

15   **Improper Character Evidence or Prior Bad Acts of Defendants**

16   *Defendants' Argument*

17   Defendants argue that Caruso may attempt to introduce improper character evidence or

18 evidence of prior bad acts.  However, under FRE 404(b), such evidence is improper to prove

19 action done in conformity with the prior alleged act.  All evidence or argument concerning

20 character evidence should be precluded.

21   *Plaintiff's Opposition*

22   Caruso argues that this is a five-line motion that does not provide sufficient specificity

23 because no bad acts are identified.  Caruso then argues that the Defendants' engaged in three bad

24 acts that are admissible.  First, Defendants caused her handcuffing chrono to be rescinded.

25 Second, Defendants withheld key documents and have not produced the original signed incident

26 reports to this day.  Third, Defendants interfered with Caruso's access to her attorney and made

27 false and scandalous allegations against her attorney.  Caruso argues that these actions are relevant

28 and admissible.

1

*Discussion*

2 No specific "bad acts" are identified in this motion.  A blanket request to enforce Rule

3 404(b) is improper.  It goes without saying that the Court will enforce the Federal Rules of

4 Evidence.  Without specifics, this motion cannot be granted.

5 With respect to the three bad acts identified by Caruso, two of those acts have been

6 resolved in prior rulings, one on Defendants' motion in limine three (rescission of Caruso's

7 medical chronos) and the other on Defendants' motion in limine seven/Caruso's motion in limine

8 four (discovery issues relating to the production of various versions of the incident report).  As to

9 the attempted interference of Defendants with Caruso's ability to confer with her attorney, the

10 documents cited in support of this argument are filings in this Court.  Those filings involve

11 directives by the Warden that limited access of Caruso's attorney to the prison.  This issue was

12 litigated before the Magistrate Judge.  This was essentially a legal dispute between the attorneys

13 regarding orders by the Warden (who is not a party); they are not sufficiently connected to the

14 Defendants.  Contrary to Caruso's argument, the "attorney access" bad act occurred six years after

15 the July 22 incident and does not show that any Defendant participated in the strip search or the

16 handcuffing of Caruso with malice or oppression.  The issue of interference with access to counsel

17 is a legal issues involving the attorneys, the Warden of CCWF, and the California Attorney

18 General's office.  There is no probative value to the access issues in this case.  Evidence

19 concerning the "attorney access" bad acts will be precluded as irrelevant, confusing, unduly time

20 consuming, and unduly prejudicial.

21

*Ruling*

22 Defendants' ninth motion in limine is granted in part and denied in part.  The Court will

23 enforce the Rules of Evidence, including FRE 404(b).  The Court's rulings on Defendants' motion

24 in limine three and Defendants' motion in limine seven/Caruso's motion in limine four are

25 reincorporated into the resolution of this motion in limine.  Evidence regarding interference with

26 Caruso's counsel's access to CCWF prison is inadmissible under FRE 401 and FRE 403.

27

28

**9.** **Motion in Limine No. 11 -- Preclude Evidence or Argument about Other**

**Incidents at CCWF**

*Defendants' Argument*

Defendants argue that Caruso intends to offer evidence by non-defendant correctional officers about conduct that occurred in other searches of Caruso.  Specifically, Caruso intends to argue that the actions of other officers during a July 3, 2013 (erroneously identified as "July 13, 2013) search and a March 10, 2014 search are evidence that Defendants violated her rights during the July 22, 2013 search.  The conduct of different officers during different searches and involving different contraband is irrelevant, misleading, and confusing and should be excluded under FRE 403.

*Plaintiff's Opposition*

Caruso states that she does not oppose exclusion of the March 10, 2014 search.  With respect to the July 3, 2013 search, that incident is relevant and admissible to explain to the jury what the policies, practices, and procedures were at CCWF regarding clothed and unclothed body searches of female prisoners.  A hotly disputed issue is whether Defendants performed a clothed or unclothed body search.  Defendants and their expert will say that the search was a clothed body search that complied with applicable regulations.  Caruso contends that an unclothed body search and visual cavity search occurred that violated applicable policies and procedures.  Given the withdrawal of her expert, Caruso can only rely on her own testimony and other prisoners to show that Defendants conducted an unclothed body search that violated practice and procedures (including state regulations, CDCR policies, and CCWF prison policies).  The July 3 search is relevant to demonstrate the unwritten policies and practices that were strictly observed at CCWF regarding clothed body searches of female prisoners.  During the July 3 search, an officer observed Caruso remove contraband from her pants and give it to another prisoner.  The officer asked Caruso what was being concealed, Caruso reached into her pants and removed a tobacco pouch, the officered advised that she would request a clothed body search, Caruso reached back into her pants and removed a lighter, and Caruso confirmed that was all she had.  The officer requested a clothed body search, Caruso refused, a sergeant was contacted, the sergeant asked

1   Caruso to submit to a clothed body search, and Caruso refused.  Caruso was then placed in

2   handcuffs and escorted to a program office where an unclothed body search occurred.

3        Alternatively, the July 3 incident (which occurred less than 3 weeks before the incident in

4   this case) is relevant to show Caruso's intent under FRE 404(b).  Defendants will argue that

5   Caruso refused to comply with their orders by repeatedly lowering herself to the ground,

6   purportedly in an effort to prevent any search by Defendants.  Caruso's position is that she

7   repeatedly fell to the ground because of the excruciating pain caused by the handcuffs behind her

8   back.  The July 3 event shows that she was not trying to evade the search on July 22.

9        *Discussion*

10       All agree that the March 10, 2014 search is inadmissible.  Therefore, evidence of that

11  search will be excluded.

12       As for the July 3 search, the Court has several concerns.  First, a single search is

13  insufficient to establish customs, policies and practices, either written or unwritten, at CCWF.  In

14  the context of *Monell* liability, which is liability against a municipality for a practice, custom, or

15  policy that causes a constitutional violation, evidence of one other constitutional violation, in

16  addition to the constitutional violation at issue, will not establish a policy, practice, or custom

17  because the sample size is too small.  See Trevino v. Gates, 99 F.3d 911, 918 (9th Cir. 1996)

18  (finding that two incidents cannot establish a custom or practice).  The same is true here.  What

19  happened with one earlier search, involving different personnel, under different circumstances,

20  and involving different contraband, simply does not establish the policies and practices of CCWF.

21       Second, to the extent that  CCWF's policies are even relevant, the policies can speak for

22  themselves.  There does not appear to be great relevance.  Caruso's cause of action is for violation

23  of the Fourth Amendment, not violation of CCWF policies.  Under Caruso's Fourth Amendment

24  theory/version of events, because an unclothed strip search occurred in the close physical presence

25  of men, the Defendants must show that an emergency existed.  Byrd v. Maricopa Cty. Sheriff's

26  Dep't, 629 F.3d 1135, 1141 (9th Cir. 2011).  If the jury believes Caruso and does not find an

27  emergency, Caruso will prevail; the policies and practices of CCWF would not seem to matter to

28  the issues of Caruso's credibility or the existence of an emergency.  Further, and again, how other

guards under different circumstances at one other time conducted a search does not necessarily show CCWF policy, it just shows those guards' possible interpretation of a policy.[11]

Third, in terms of FRE 404(b), the July 3 search does not appear to have a relevant purpose.  Carso is correct that the parties dispute why she went to the ground.  However, it is unknown how Caruso collapsing to the ground justifies either a strip search or the continued handcuffing of Caruso behind her back while maneuvering her to cause pain.  Caruso went to the ground well after she was handcuffed behind her back.  The jury will not be asked to determine why Caruso went to the ground.  Further, at best, the July 3 evidence might show that Caruso went to the ground since she was in pain because she is normally compliant.  But that it is actually a prohibited Rule 404(b) purpose since it shows Caruso acted in conformity with her compliant character.  Finally, it is unclear that the circumstances of the July 3 search are sufficiently similar to the July 22 incident.  In particular, Caruso was found with tobacco and a lighter on July 3; on July 22, she was found with illegal narcotics.  The July 3 incident is a rules violation; the July 22 is a crime.  There is more incentive to resist a search involving illegal drugs than one involving "cigarette supplies."  There is a significant risk that the jury could be confused by this evidence and that it would result in a contentious mini-trial.

In short, the probative value of the July 3 search is minimal, and the FRE 403 concerns substantially outweigh that minimal probative value.  Contrary to Caruso's arguments, the July 3 event does not prove either written unwritten practices, the written practices (to the extent that they are relevant) will speak for themselves.  Caruso's intent or motive in going to the ground does not appear to be a significant issue, and there are substantial differences between the July 3 and July 22 searches.  Therefore, FRE 404(b) has not been shown to provide a basis for admissibility and does not cure the FRE 403 problems.

---

[11] Generally, the reasonableness of a search in prison is weighed against four factors: (1) scope of the intrusion, (2) manner in which the search was conducted; (3) justification for the search; and (4) place where the search occurred.  See Bell v. Wolfish, 441 U.S. 520, 528 (1979); Nunez v. Duncan, 591 F.3d 1217, 1228 (9th Cir. 2010).  Even under this standard for evaluating the search, as opposed to Byrd, CCWF policy regarding searches may be relevant only to the second consideration.  However, again, the policy can speak for itself.  How other guards in other circumstances acted or interpreted any relevant policy is confusing, misleading, and would likely result in a mini-trial.  Exclusion under FRE 403 would be appropriate.

1    *Ruling*

2    Defendants' eleventh motion in limine is granted.  Caruso is precluded from offering

3    evidence concerning the July 3, 2013 and March 10, 2014 cell searches.

4    **10.    Motion in Limine No. 12 -- Preclude Evidence or Argument that Plaintiff Was**

5    **Gang Raped in the Past**

6    *Defendants' Argument*

7    Defendants argue that Caruso intends to offer evidence that she was gang raped in the past

8    and that the actions of Defendants traumatized her.  However, there is no evidence that the July

9    22, 2013 incident involved a gang-rape, and Caruso's sexual assault claims have been dismissed.

10   Since there is no evidence that any Defendant penetrated Caruso's anus or vagina during the

11   incident, the prior gang rape is dissimilar to the incident.  The evidence is improperly confusing

12   and inflammatory and should be excluded under FRE 403.

13   *Plaintiff's Opposition*

14   In § 1983 cases, a defendant takes the plaintiff as he finds her, meaning that the eggshell

15   plaintiff doctrine applies.  Applying that doctrine in this case means that evidence of the prior

16   gang rape is relevant to proving Caruso's emotional distress damages.  Specifically, her emotional

17   distress was exacerbated by the prior gang rape.  Contrary to Defendants' suggestion, Caruso

18   states that she is not attempting to use the evidence to support a sexual assault claim against the

19   Defendants.  Caruso disclosed her history of past sexual abuse/violence during discovery, and her

20   602 prison appeal noted that the Defendants' actions made her feel like she was being raped.  That

21   Defendants did not conduct further discovery on the issue is their own fault.

22   *Discussion*

23   The Court generally agrees with Caruso.  The eggshell skull doctrine, i.e. the defendant

24   takes his victim as he finds him, is a recognized theory in § 1983 cases.  See Richman v. Sheahan,

25   512 F.3d 876, 884 (7th Cir. 2008); Gibson v. County of Washoe, 290 F.3d 1175, 1192-93 (9th Cir.

26   2002).  There is no dispute that Caruso was previously gang raped.  Caruso's testimony/version of

27   the search at issue has elements that could be similar to a rape.  Caruso testified that she was

28   leaned over a table at the waist, her hands were cuffed behind her back (meaning her ability to

resist was severely limited), and her pants and underwear were pulled down, exposing her buttocks and vagina, and two men were helping to hold Caruso on the table.  While there was clearly not a rape in this case, it takes little imagination to see how the nature of the search at issue (under Caruso's version of events) could resemble a gang rape scenario and how Caruso's mental distress could be affected by her prior experience.  However, extensive testimony and graphic detail regarding the past rape is unnecessary.  Extensive and graphic testimony would create a serious risk of jury confusion and undue prejudice to the Defendants and thus, will be excluded under FRE 403.  Caruso can testify that she was gang raped in the past, the search was similar to that rape, and that the search brought back many of the same traumas/mental distresses or made her more susceptible to such traumas.  A limiting instruction is appropriate for this testimony.  The parties will meet and confer to attempt to agree upon an appropriate limiting instruction for the Court to read in connection with Caruso's testimony about the past gang rape.[12]

*Ruling*

Defendants' twelfth motion in limine is generally denied.  However, the parties shall meet and confer for the purpose of presenting a limiting instruction.  Further, Caruso's testimony regarding a prior gang rape is admissible to a limited degree and with the understanding that graphic and extensive testimony will not be permitted under FRE 403.

**11.    Motion in Limine No. 13 -- Preclude Evidence or Argument Concerning the Alleged Retaliatory Transfer in *Caruso v. Hill***

*Defendants' Argument*

Defendants argue that Caruso may offer evidence of the alleged retaliatory transfer in *Caruso v. Hill*.  However, there is no evidence that Defendants had any involvement in that transfer.  Because Defendants had nothing to do with the transfer, evidence of it is confusing and irrelevant.

---

[12] As a starting point, the Court suggests the following limiting instruction:  "There is no claim in this case that Gina Caruso was raped/gang raped.  Gina Caruso's testimony regarding a past gang rape is only to be considered by you for the purpose of assessing whether and to what degree, if any, Ms. Caruso suffered mental anguish in connection with the search of her person in this case.  In turn, the nature and degree of any mental destress suffered by Gina Caruso is to be considered by you only for purposes of computing damages, if any."  The parties are not bound by this proposed instruction.  If the parties can file a stipulated limiting instruction, the Court will give that stipulated instruction.

1    *Plaintiff's Opposition*

2        Caruso does not oppose this motion to exclude evidence of the retaliatory transfer in

3    *Caruso v. Hill*.  However, Caruso states that she reserves the right to revisit this issue if evidence

4    is uncovered that the Defendants participated in the retaliatory transfer.

5    *Discussion*

6        *Caruso v. Hill* is a separate but related case that is assigned to the undersigned.  As

7    indicated by the parties, *Caruso v. Hill* centers around the involuntary transfer of Caruso from the

8    CIW prison to the CCWF prison.  All parties acknowledge that, at least at this point, there is

9    nothing to connect the Defendants to the alleged retaliatory transfer.  Thus, this motion can be

10   granted under FRE 401 and FRE 403.  If Caruso discovers new evidence that links any Defendant

11   to the involuntary transfer, she may file a motion for reconsideration.[13]

12   *Ruling*

13       Defendants' thirteenth motion in limine is granted.  Evidence regarding the retaliatory

14   transfer that forms the basis of the *Caruso v. Hill* case is excluded at this time.

15

16                              **ORDER**

17       Accordingly, IT IS HEREBY ORDERED that:

18   1.    Plaintiffs' motions in limine (Doc. Nos. 245, 246, 247, 248, 253, 259) are GRANTED IN

19         PART and DENIED IN PART as explained above; and

20   2.    Defendants' motions in limine (Doc. No. 244) is GRANTED IN PART and DENIED IN

21         PART as explained above.

22

23   IT IS SO ORDERED.

24   Dated:   December 30, 2020        _____

25                              SENIOR  DISTRICT  JUDGE

26

27

28   ───────────────────────
     [13] By permitting Caruso to file for reconsideration, the Court is not holding that the result of this motion would
     change.

                              46