1
2
3            **UNITED STATES DISTRICT COURT**
4            **EASTERN DISTRICT OF CALIFORNIA**
5

| | |
|---|---|
| 6  **GINA CARUSO,** | **CASE NO. 1:15-CV-780 AWI EPG (PC)** |
| 7           **Plaintiff** | |
| 8      **v.** | **ORDER ON PLAINTIFF'S MOTION FOR AN ADVERSE INFERENCE INSTRUCTION AND OTHER RELIEF,** |
| 9  **OFFICER G. SOLORIO, OFFICER C. LOPEZ, SGT. G. INGRAM, and OFFICER D. MARTINEZ,** | **ORDER REQUIRING DEFENSE COUNSEL TO SUBMIT ADDITIONAL INFORMATION, and ORDER SETTING TELEPHONIC STATUS CONFERENCE** |
| 11          **Defendants** | |
| 12 | (Doc. No. 291) |

13
14
15        This case arises out of an encounter between incarcerated Plaintiff Gina Caruso ("Caruso")
16   and Defendant prison guards G. Solorio ("Solorio"), C. Lopez ("Lopez"), D. Martinez
17   ("Martinez"), and Sgt. G. Ingram ("Ingram") (collectively "Defendants").  The operative
18   complaint is the Second Amended Complaint ("SAC").  The SAC contains two viable claims
19   under 42 U.S.C. § 1983, an Eighth Amendment claim for excessive force and a Fourth
20   Amendment claim for an unreasonable search.  Currently before the Court is Caruso's motion for
21   an adverse inference instruction, monetary sanctions, and preclusion of evidence.  This order
22   resolves Caruso's multifaceted motion.

23                          **BACKGROUND**
24        1.      <u>General Background</u>[1]
25        At all times relevant to the issues raised in this case, Caruso was imprisoned at the Central

---

[1] The parties are familiar with the facts of this case.  A detailed description of the facts can be found in the Court's order on Defendants' motion for summary judgment.  See Caruso v. Solorio, 2020 U.S. Dist. LEXIS 51994 (E.D. Cal. Mar. 25, 2020).

California Women's Facility prison ("CCWF").  Defendants Officers Solorio, Lopez, and
Martinez, as well as Sgt. Ingram were members of the CCWF Investigative Service Unit ("ISU").

On July 22, 2013, ISU staff received information that inmates in Cell 3 of Building 511 possessed contraband, likely drugs and cell phones.  Upon arrival at Cell 3 at about 12:30 p.m., Caruso and her cellmate Littlefield were ordered to exit the cell.  As Littlefield exited, Lopez observed Caruso put a bindle in the back of her pants near her rectal area.  Caruso had secreted the bindle in between her buttocks and near her anus.  Lopez then entered Cell 3 and immediately handcuffed Caruso behind her back.  At this point, the parties dispute precisely what happened. However, accepting Caruso's allegations, Caruso was handcuffed behind her back despite not resisting and despite a medical directive/chrono for front cuffing (Caruso had pre-existing spinal problems), was repeatedly maneuvered by the handcuffs in such a way as to cause excruciating pain, and was subjected to a strip search with the participation of male ISU officers despite the absence of an emergency.  Drugs and a cellphone were recovered from Caruso.  Caruso was placed awkwardly in a wheelchair with her handcuffed hands raised above the back of the wheelchair, which continued to cause Caruso pain.  Caruso was wheeled to the ISU office for a more thorough strip search and was crying out in pain during transport.  No further contraband was discovered.

    2.        CCWF Incident Reporting Practice in July 2013

In 2013, incident reports were referred to as CDCR 837's ("CDCR 837").  See Huang Reply Dec. Ex. 17.  Relevant to this case, a CDCR 837 is composed of several additional forms and sub-reports:  (1) CDC 837-A's, which are cover sheets that *inter alia* identify a specific crime or incident at issue and provide a one to two sentence description of the incident; (2) CDC 837-A1's, which are supplements to the CDC 837-A and may contain a complete synopsis of the incident, supplemental information, amended information, or a closure report; (3) CDC 837-B1's, which identify the inmate(s) involved in the incident and *inter alia* describe any injuries suffered by the inmate(s); (4) CDC 837-B2's, which identify all prison staff involved in the incident and *inter alia* describe any injuries suffered by staff; (5) CDC 837-C's, which are the first pages of each involved staff member's individual report of the incident; and (6) CDC 837-C1's, which are

supplements to CDC 837-C's and which are used to continue lengthy narratives, provide clarification (presumably of a previous report), or provide additional information (presumably to a previous report).  See Huang Dec. Ex. 13; Huang Reply Dec. Ex. 17.[2]

Upon the occurrence of a crime or "incident," the duty Watch Commander assigns the incident an Incident Log Number.  See Huang Reply Dec. Ex. 17; see also Huang Dec. Ex. 13. The Incident Log Number appears on every page of the constituent forms of a CDCR 837.  See Huang Dec. Ex. 13.  Once an "incident" is assigned an Incident Log Number, the Incident Commander has 24 hours to complete CDC 837-A's, 837-A1's, and all 837-B's.  See Huang Reply Dec. Ex. 17; see also Villegas Depo. 25:21-26:23.

Each staff member who is involved in or witnesses an "incident" completes CDC 837-C and CDC 837-C1 forms.  See Huang Reply Dec. Ex. 17.  These forms can be typed or handwritten in ink, but a reporting member must initial any handwritten changes to these forms.  See id.  Staff members could fill out these forms electronically on the Daily Information Reporting System ("DIRS"), but changes to forms completed on DIRS still apparently had to be made by hand notation.  See Martinez Depo. 25:15-18, 100:1-14; see also Huang Dec. Ex. 13.  Staff members who are involved in an incident are expected to complete these forms prior to the end of their shift. See Huang Reply Dec. Ex. 17.  If a staff member completed a CDC 837-C or 837 C-1 on DIRS, that form would be saved within the DIRS system.  See Villegas Depo. at 38:24-39:5, 50:1-6. Once a CDC 837-C or 837-C1 is completed, a signed hard copy is submitted to the Incident Commander.  See id. at 44:6-25.

The Incident Commander is required to complete and upload the CDC 837-A's, 837-A1's, and all 837-B's to DIRS for review by headquarters.[3]  See Huang Reply Dec. Ex. 17; Villegas Depo. 25:21-26:23.  Once the Incident Commander uploads these forms to DIRS, changes or corrections can only be done through an amended version of the CDC 837-A, 837-A1, 837-B1, or

---

[2] A CDC 837-B3, which appear to identify any visitor who witnessed or somehow participated in the incident, and a CDC 837-C2, which is entitled "Review Notice," may also be part of a CDCR 837.  However, CDC 837-B3's and CDC 837-C2's do not appear to be at issue in this case and were not part of any CDCR 837 or drafts that have been produced in this case.  Therefore, the Court will not reference these forms further in this order.

[3] The DIRS system is no longer used at CCWF, possibly since 2017.  See Martinez Depo. 25:10-14.  The nature and extent of any DIRS-archived documents is unknown.

837-B2's.  See Villegas Depo. 30:7-12.  Changes to incident forms can be detected by the Incident

Log Number on the CDC forms which will end with "A1," "A2," etc., depending how many times

a document has been amended.  See id. 88:8-11.  The Incident Commander also prepares a

physical Incident Packet.  See id. at 31:4-17.  The physical Incident Packet is a folder with a

checklist cover and includes all signed CDC 837 A's, B's, and C's,[4] and any medical forms,

photos, use of force critiques, and other orders or forms that may have been generated as a result

of an incident.  See id. at 31:15-32:12, 44:17-45:5, 86:15-24.  The physical Incident Packet is more

comprehensive than the forms that are uploaded by the Incident Commander to the DIRS system.

See id.  The physical Incident Packet is generally to be submitted within 24 to 48 hours of an

incident and is sent for an institutional level of review, including the use of force committee if

force was used in the incident.  See id. at 32:7-24, 35:23-36:9; Huang Reply Dec. Ex. 17.[5]

      The ISU would receive copies of the physical Incident Package that was submitted by the

Incident Commander for institutional review after review was completed, but whether the ISU

received every document that was part of the physical Incident Packet is unknown.  See id. at

36:13-21, 37:4-14.  The copies of physical Incident Packets sent back to the ISU are stored in

binders in the ISU office.  See id. at 37:15-20.  The physical Incident Packets are likely stored in

binders for 5 years before being destroyed.  See Ingram Depo. 35:15-23 (stating that he believed

the reports were stored for 5 years before being destroyed, although it might be 10 years); Huang

Dec. at ¶ 2 & Ex. 1 (explaining that during a 2019 site visit to the ISU office, she saw binders of

Incident Packets dating back to 2015).  Additionally, it appears that if force was used, the Use of

Force Coordinator would keep a copy of the Incident Packet, but it is unclear whether every

document submitted in a physical Incident Report was retained by the Use of Force Coordinator.

See Villegas Depo. at 38:10-19.

---

[4] CDC forms completed on and stored within the DIRS system do not contain signatures; data is merely entered and stored within DIRS.  See Villegas Depo. 88:12-21.

[5] The precise deadline for filing a completed physical Incident Packet is unclear.  Lt. Villegas testified that the time limit was 24 hours.  See Villegas Depo. at 31:4-32:15.  However, a written CCWF policy indicates that CDC 837-A's, A1's, and B's are to be completed in 24 hours and all other reports are to be completed within 48 hours.  See Huang Dec. Ex. 17.  The written CCWF policy is not entirely clear, but it appears to the Court that the policy seems to envision fully completed Incident Reports, including both the limited forms uploaded through DIRS and the physical Incident Packet, within 48 hours of an incident.  See id.

3.    Reporting Actions in This Case

Ingram testified that he believed that all officers involved in the July 22, 2013 incident (himself, Lopez, Martinez, and Solorio) submitted reports (which would be CDC 837-C and C-1 forms) before their July 22 shift ended.  See Ingram Depo. at 101:2-4; 103:15-19.  The reports could have been entered on the DIRS system on either July 22 or July 23.  See Ingram Depo. at 103:20-25.  In interrogatory responses, Martinez and Ingram responded that they submitted their CDC 837-C and C1 sub-reports on July 22, 2013, while Lopez and Solorio responded that they submitted their sub-reports on July 23, 2013.  See Doc. No. 166-3.  Martinez testified that he typed his CDC 837-C and C1 forms in the DIRS system.  See Martinez Depo. 25:2-8.  Solorio testified that she believed that she used the DIRS system to complete her CDC 837-C and C1 forms, but that she believed that she provided Ingram with a corrected copy on July 23, 2013.  See Solorio Depo. at 104:6-25.  The CDC 837-C and C1 reports of Solorio and Lopez that were produced in this case are dated July 23, 2013.  See Huang Dec. Ex. 13.

Villegas completed the CDC 837-A, A1, B1, and B2 forms on July 22, 2013.  See Villegas Depo. at 86:25-87:5.  Villegas's practice was to complete these forms after reviewing hardcopies of CDC 837-C and C1 forms that had been completed by involved staff.  See id. at 44:6-13.  In preparing the CDC 837-A, A1, B1, and B2 forms in this case, Villegas testified that he relied on CDC 837-C and C1 forms completed by all involved staff, a medical report, photographs, and the results of a Narcotics Identification Kit.  See id. at 88:22-89:12, 90:24-91:2.  There is no indication that Villegas was unable to complete the physical Incident Package within 24 to 48 hours of the July 22, 2013 incident.

Villegas prepared an amended version of the CDC 837-A and A1 forms on July 29, 2013.[6]

---

[6] Defendants argue that Villegas testified that once the narcotics testing, photographs, urinalysis testing, *Miranda* advisement, and Form 7219 (prison medical form) were completed and evaluated, the Incident Report was finalized on July 29, 2013.  See Doc. No. 294 at 10-12.  The deposition page cited by Defendants does not actually support this argument.  Page 86 of Villegas's deposition merely states that the sub-reports that Villegas was reviewing (draft CDC 837-A, A1, B1, and B2 forms produced to Caruso in February 2019) were drafts because those documents did not have signatures.  The cited page does not say that the amended Incident Report was finalized because other tests results or evidence were received, nor does the cited page discuss the criteria for finalizing an incident report.  Moreover, Villegas explained that he created the draft sub-reports on July 22, 2013 and that he did so after reviewing photographs, CDC 837-C sub-reports, the Form 7219 (by policy this form is to be completed within 24 hours an incident, see Huang Reply Dec. Ex. 17), and the results of the narcotics tests.  See Villegas Depo. 86:13-87:5, 88:22-89:12.  Therefore, Defendants' argument is not supported by Villegas's deposition or any other cited evidence.

1  See id. at 91:21-24.  The last amended CDC 837-A1 page expressly identifies changes that were

2  made to the original CDC 837-A and A1 sub-reports.  See Huang Dec. Ex. 13.  One

3  change/amendment identified indicates that the title of the offense involved was changed from

4  "Stimulants and Sedatives – Distribution of a Controlled Substance" to "Force and Violence –

5  Resisting and/or Obstructing a Peace Officer, Resulting in Use of Force."  See id.  Another

6  identified change indicated that a notation of no-force-used was changed to force-used.  See id.

7  Villegas questioned whether the 837-C and C1 forms attached to the amended CDC 837-A and A1

8  forms where the forms that he reviewed in preparing the Incident Packet on July 22, 2013.  See id.

9  at 92:14-18.  Villegas had questions because the title/crime identified on the 837-C's was

10  "Resisting and obstructing a peace officer resulting in the use of force."  Id. at 92:18-21.  Villegas

11  thought the title could have differed from the CDC 837-C forms that he reviewed on July 22,

12  2013, and ultimately was sure that the title did change.  See id. at 92:21-93:4.  When asked why an

13  unsigned version of the CDC 837-A1's that he had prepared had a notation that no force was used,

14  but that the narrative section indicated that force was used, Villegas replied that "[t]his could have

15  been typographical on my behalf, but at the same time this was not the completed and signed

16  incident report, so this very well could have still been in draft form."  Id. at 100:1-17.

17       4.    Discovery Actions

18       In July 2017, defense counsel issued an evidence preservation letter to CCWF and

19  requested that CCWF produce complete copies of the entire incident package and all ISU reports

20  and investigative documents for the July 22, 2013 incident.  See Huang Dec. (Doc. No. 293) at Ex.

21  7 at 2:12-15, Ex. 14.  In response, defense counsel received the amended Incident Package, i.e. a

22  package that had an Incident Log Number of CCWF-CEN-13-07-0154A1 and dated July 29, 2013.

23  See id. at 2:15-17.  Plaintiff was given this Incident Package in September 2017.

24       On January 18, 2018, defense counsel contacted CCWF Litigation Coordinator Rowan to

25  inquire about incident reports that were produced and sent within 24 hours of the incident and

26  whether there are additional or amended copies of the incident reports from July 22, 2013 that

27  were time-stamped in any manner.  See id. at 3:14-17. Rowan responded on February 5, 2018, that

28  staff had been searching through the incident report archives and found no responsive documents.

See id. at 3:21-23.  Rowan explained that the absence of any other incident reports in the archives likely meant that the original Incident Package had been purged.  See id. at 3:23-24.  On February 13, 2018, Rowan again contacted defense counsel and confirmed that additional investigative efforts had yielded no responsive documents to the request for additional or amended copies of the incident reports for Incident Log Number CCWF-CEN-13-07-0154.  See id. at 3:24-27.

On April 16, 2018, defense counsel asked Rowan about any handwritten versions of the 837-C incident report, an incident report for log number CCWF-CEN-13-07-0154 that had been uploaded to DIRS, or notes or screenshots from the SOMS system that would track the uploading of the incident reports from the July 2013 incident.  See id. at 3:28-4:3.

On May 4, 2018, Rowan replied to defense counsel that, due to the age of documents sought, it was her understanding that any original non-amended incident reports would have been purged.  See id. at 4:10-11.  Rowan did indicate that she would check an additional system (CONEX) and respond again to counsel.  See id. at 4:12-13.

On May 10, 2018, Rowan replied to defense counsel that nothing in the CONEX system was responsive.  See id. at 4:17-18.

On May 11, 2018, Rowan informed counsel that staff's search had not revealed any handwritten or original non-amended documents for Incident Log Number CCWF-CEN-13-07-0154.  See id. at 4:20-22.

From May 18, 2018 to May 23, 2018, defense counsel worked with Defendants on their responses to discovery and to determine if there were any other locations where an older incident report could be stored.  See id. at 4:26-28.  Defendants did not have possession of the original incident report and did not have access to look into DIRS as far back as 2013.  See id. at 4:28-5:1.

In late May 2018, all defendants responded to interrogatories.  See Huang Sanctions Reply Dec. (Doc. No. 167-1) at Ex. 18; Huang Dec. Ex. 2.  With respect to Interrogatory No. 2, which asked about individuals who amended incident reports and when each amended report was uploaded into a computer system, each Defendants responded:  "[T]o the extent Plaintiff is referring to the process in ERMS in 2013 regarding incident report  Log No. CCWF-CEN-13-07-0154A1 . . . [Lt.] Villegas amended the original IR . . . ."  Id.  The response then identified the

changes that were identified in the last CDC 837-A1 form of the amended Incident Package.  See
id.  With respect to Interrogatory No. 3, which asked about individuals who can access *inter alia*
an incident report from a computer system and make deletions or changes and whether a digital
footprint of some kind would exist to indicate that deletions had been made, all Defendants made
the same response.  See id.  All Defendants responded that, to the extent that Caruso was referring
to the amended report (Incident Log Number CCWF-CEN-13-07-0154A1), "Once the Watch
Commander uploads an [Incident Report] into DIRS, it remains there.  It can be amended by the
Incident Commander, the original remains in DIRS with the amended version listed with the
original. The original would not be deleted." Id.

On January 25, 2019, defense counsel met with Defendants in advance of their depositions.
See Huang Dec. at Ex. 7 at 5:13-14.  Defendants did not have possession of or access to an
original non-amended incident report for Incident Log Number CCWF-CEN-13-07-0154 or access
to DIRS dating back to 2013.  See id. at 5:14-16.  Also, sometime prior to January 25, 2019,
Defendant Ingram had retired and did not have access to DIRS.  See id. at 5:16-17.

On February 28, 2019, defense counsel contacted new CCWF Litigation Coordinator
Smith about an original incident report for Incident Log Number CCWF-CEN-13-07-0154.  See
id. at 5:18-19.  The same day, Smith sent an "original report" for Incident Log Number CCWF-
CEN-13-07-0154.  See id. at 5:19-20.  Smith explained that the Use of Force Coordinator had
tracked down this "original report" and "that the original had no signatures because ISU used the
amended soon after.  The changes made from the original were denoted on the amended incident
report on page seven." Id. at 5:20-23.  This "original report" was produced to Caruso's counsel
the same day, February 28, 2019.  See id. at 5:23-24.  This "original" report consists of unsigned
CDC 837 A, A1, B1, and B2 sub-reports for Incident Log Number CCWF-CEN-13-07-0154.  See
Huang Dec. Ex. 5.

5.    Sanctions Order

On November 26, 2019, the Magistrate Judge sanctioned Defendants (but not defense
counsel) for not timely producing a draft version of the CDC 837-A, 837-A1, 837-B1, and 837-B2
sub-reports.  See Doc. No. 212 ("Sanctions Order").  The Sanctions Order described the discovery

process in which interrogatories, motions to compel, and orders granting motions to compel were all part of the process by which Caruso was attempting to obtain all versions of the various CDC 837 forms in this case.  See id.  As part of the Sanctions Order, the Magistrate Judge made a number of findings, including:  (1) Defendants initially produced only the final incident report in discovery; (2) draft versions of the CDC 837-A, 837-A1, 837-B1, and 837-B2 sub-reports were produced to Caruso on February 28, 2019; (3) most likely all remaining drafts of the incident report have been produced; (4) it could not be determined whether there were additional versions of the report that previously existed; (5) a holding could not be made that Defendants continue to withhold additional versions of the incident report; (6) no sanctions for continued concealment of any other versions of the incident report would be made; (7) a finding could not be made that purposeful spoliation occurred; (8) an earlier version of the incident report had been found by Defendant Ingram in July 2018; (9) Ingram's deposition testimony indicates that the litigation coordinator had also found the earlier version of the incident report and the litigation coordinator declined Ingram's offer to print the earlier version; (10) Caruso was not barred by the Sanctions Order from presenting evidence that another version of the report existed at some time.  See id. at 11:20-14:16.  Caruso had requested that the Magistrate Judge sanction Defendants with an adverse inference instruction, additional limited discovery, and monetary sanctions.  See Doc. No. 161 at 20:21-26.  However, the only sanctions imposed were monetary, specifically the fees and costs associated with bringing the motion for sanctions.  See Doc. No. 212 at 15:13-15.  Thus, Caruso's request for sanctions was "granted in part and denied in part."  Id. at 15:11-18.

The Court denied a reconsideration motion by Defendants and held that the Sanctions Order's imposition of monetary sanctions was not clearly erroneous or contrary to law.  See Doc. No. 286.  Caruso did not seek reconsideration of any aspect of the Sanctions Order.  With the resolution of Defendants' motion for reconsideration, the Court considers the Sanctions Order generally to be final.  Cf. Local Rule 303(b) ("Rulings by Magistrate Judges pursuant to this Rule shall be final if no reconsideration thereof is sought from the Court within fourteen (14) days calculated from the date of service of the ruling . . . .").

1      6.      Motions In Limine

2          The Court has resolved two motions in limine that involved discovery efforts concerning

3  various versions of the Incident Report.  The Court ruled that Caruso could "admit the draft

4  incident report and amended incident report and may ask Defendants any relevant questions

5  regarding any version of the incident report (original, draft, or amended)," but that under Federal

6  Rule of Evidence 403, "no evidence or argument regarding discovery sanctions, discovery history,

7  and discovery conduct regarding production of any version of the incident report will be

8  permitted."  Doc. No. 287 at 16:7-12.  The Court ended its analysis by noting that "Caruso has all

9  documents in existence and there is a finding that is adverse to her in terms of spoliation."  Id. at

10  16:4-5.  The Court relied largely on the findings of the Sanctions Order in reaching these

11  conclusions.  See id. at 15:1-16:5.

12      7.      Testimony of Defendant Ingram

13          At his deposition, Defendant Ingram testified that he reviewed the "837 Package" in

14  preparation for his deposition.  See Ingram Depo. at 8:4-22.  When asked if the incident report that

15  he reviewed was the "amended report," Ingram replied "both" and explained that he had reviewed

16  the original and amended incident reports.  Id. at 8:24-9:5.  Ingram stated he obtained the original

17  incident report off of DIRS and that report was not signed; the amended report that he reviewed

18  was signed.  Id. at 9:6-11.  Ingram explained that in July 2018, he accessed the DIRS archive and

19  found the original incident report.  Id. at 9:12-17.  Ingram stated that he believed that the litigation

20  coordinator needed the original report and he was trying to locate it for her.  See id. at 9:17-19.

21  When Ingram located the original incident report, the litigation coordinator said that she already

22  had the report and that there was no need for Ingram to print or forward the report to her.  See id.

23  at 9:19-10:4.  Ingram accessed the DIRS archive at a time when he was a Watch Commander.  See

24  id. at 10:8-11.

25          When asked how he could access hard copies of old incident reports, Ingram responded:

26  "Normally they – they're put within the ISU, but being that was amended, I tried – looked in the

27  ISU to see if there was an original copy in there, and the only one was the amended one, but

28  normally the 837s, they all go back to the ISU, and they're filed there."  Id. at 10:17-24.

In a supplemental declaration, Ingram declared in relevant part:

> [In my deposition at page 8, line 19 to page 10, line 22], I discussed my 2018 review of the unsigned original and the signed amended incident reports. When I indicated "original" in my testimony, I was referring to the reports that were authored in DIRS, but were not adopted and implemented by the institution. It is my understanding that this draft report has been provided to Plaintiff's counsel and is reflected in ECF No. 162-6, pages 1-11. The "amended" incident report in my testimony refers to the incident report that was signed, and reviewed at the institutional level, before being forwarded to the District Attorney's Office. It is my understanding that this amended report has been provided to Plaintiff's counsel and is reflected in ECF No. 166-1, pages 9-28.

Ingram Dec. (Doc. No. 171) at ¶ 2. Document No. 162-6 is the unsigned CDC 837-A, A1, B1, and B2 forms that were produced to Caruso in February 2019. Document No. 166-2 is the amend or final signed CDC 837-A, A-1, B1, B2, C, and C1 reports that were provided to Caruso in the beginning of the discovery process.

## PLAINTIFF'S MOTION

### *Plaintiff's Arguments*

Caruso argues that it is clear that she will have to try this case without the benefit of the of the original reports concerning the July 22, 2013 incident. The previous litigation does not foreclose the Court from addressing the evidentiary imbalance at trial. Defendants will likely be evasive about whether the original reports exist, and Caruso argues she should not be required to again expend considerable time and resources at trial to prove that original incident reports did exist and that they were purged while this lawsuit was pending. Caruso argues that she is entitled to: (1) a permissive adverse inference instruction to explain the jurors' fact finding powers, either a permissive or mandatory adverse inference instruction as a discovery sanction, (2) an evidentiary ruling that prevents Defendants from testifying about their efforts to locate various reports beyond what was disclosed in discovery, (3) an evidentiary ruling preventing Defendants from testifying about the content of original reports, and (4) monetary sanctions.

With respect to a permissive adverse inference instruction, courts recognize that such instructions may be given not as a sanction, but as an instruction to explain the jury's fact finding function in considering circumstantial evidence. Such instructions are common and routinely

given.  Jurors in this case will undoubtedly question the absence of original reports at trial after both sides present conflicting evidence about whether original reports existed, whether Defendants had a duty to preserve their original reports, and whether Defendants intentionally or negligently destroyed the reports.  While the Court has held that Defendants may be questioned about their original reports, and the parties agreed that the draft report can be used to question Defendants and compare it with the amended reports, the Court also held that no evidence of discovery conduct and sanctions can be admitted.  Caruso argues that she is limited in her ability to explain the exhaustive efforts she made to obtain the original reports and Defendants' various responses that the original reports were nonexistent, unavailable, or purged.  Jurors will require guidance on how to evaluate the amended incident reports without the benefit of being able to compare them to the original reports.  A permissive inference instruction best provides such guidance.

    With respect to an adverse inference instruction as a sanction, Caruso argues that the Sanctions Order does not preclude the Court from imposing an adverse inference instruction.  The Sanctions Order said that the evidence does not demonstrate purposeful spoliation and was silent on the adverse inference request.  The Sanctions Order also stated that it would not bar Caruso from presenting evidence that another version of the report existed at some time.  Unlike the prior motion for sanctions, however, this motion is made more than 1 ½ years after the prior motion was filed and is intended to remedy the continued absence of original reports.  Substantively, Defendants had a duty to preserve the original reports, the original reports are relevant, and they were purged with a culpable state of mind.  Defendants now acknowledge that original reports have not been produced, rather, only draft and amended reports have been produced.  The evidence shows that the reports were purged some time after July 2018, contrary to Defendants' interrogatory responses.  Ingram's deposition testimony shows that the original reports were available from two different sources, the DIRS archive and the CCWF litigation coordinator. Because original CDC 837-C reports were never produced, that means that these reports were purged or destroyed from two separate locations.  Three Defendants state that they prepared their reports on DIRS, which means those reports should be accessible through DIRS.  Also, according to Ingram and Villegas, original reports are stored in the ISU office for 5 to 10 years.  The original

12

reports should have been stored in those binders at least until July 2018, irrespective of a July 2017 evidence preservation letter.  Defendants Lopez and Martinez continued to work in the ISU office throughout the pendency of this case, and thus had access to the ISU archives and original incident reports.  Moreover, contrary to the false testimony of Defendants, Ingram had access to and was able to access DIRS archives in July 2018.  The evidence is sufficient to show that Defendants purposefully or willfully destroyed the original reports, or at the very least were reckless or grossly negligent in failure to preserve the reports.  Finally, Caruso argues that she has been prejudiced by Defendants' failure to preserve evidence.  Defendants will argue that the only changes to the original reports were identified in the amended reports.  However, absent court action, Caruso will not be able to show that the reports were amended beyond what is identified in the amended reports.

With respect to evidentiary rulings, Caruso argues that she should not have to expend resources to prove that original incident reports did exist and that those reports were purged by Defendants.  Defendants and Villegas should be precluded from testifying about the content of the original incident report and all witnesses should be precluded from testifying about any searches conducted for original reports (except for what has been disclosed in interrogatory responses).

Finally, under Rule 37, Defendants should be sanctioned monetarily because attempts to meet and confer about an adverse inference instruction were unsuccessful, sanctions would deter future discovery violations, and Defendants engaged in improper litigation tactics.

### *Defendants' Opposition*

Defendants argue *inter alia* that Caruso's requests for some form of adverse inference instruction require a finding spoliation, be it based on intentional or negligent conduct.  However, Caruso has not demonstrated spoliation by the Defendants.  There is no evidence that any Defendant was aware of impending litigation or undertook deliberate actions to suppress or destroy reports.  Even if one could argue that Caruso's prison grievance could give notice of impending litigation, that grievance was not filed until August 9, 2013, more than ten days after the amended Incident Report was finalized on July 29, 2013.  Otherwise, Defendants were not served with a complaint in this case until June 15, 2017.  Nothing indicates Defendants destroyed

any evidence.  Further, it is unclear how Caruso is prejudiced.  Jurors are not going to decide any issues regarding the discovery process in determining whether Caruso's Fourth and Eighth Amendment rights were violated.  Moreover, the amended Incident Report acknowledges changing the offense from "Stimulants and Sedatives – Distribution of a Controlled Substance" to "Force and Violence – Resisting and/or Obstructing a Peace Officer."  This transparency supports Caruso's case in that it concedes force was used, while the original did not.  Also, Caruso had the draft and amended reports in her possession for the deposition of a number of the Defendants and witnesses, and the amended Incident Report identifies all changes that were made to each sub-report.  No Defendant has testified that they made any changes to the factual narrative section of any of their reports.  Further, there is no evidence that Defendants were in exclusive control of any reports, nor is there evidence that any report was wrongfully purged at any point during this litigation.  Ingram did not testify that he found and read originals or drafts of all sub-reports in July 2018, rather, he only found and reviewed the reports that were produced to Caruso in February 2019.

With respect to evidentiary rulings, Defendants argue that the discovery process is not relevant to any determinations that a jury would need to make in this case.  Defendants state that they do not foresee a need to elicit testimony on the topic of discovery or draft incident reports.  Further, the Court ruled as part of the motions in limine that testimony from Caruso on the discovery process will not be permitted.  Unless Caruso defies the Court's in limine order, Defendants do not anticipate a need for the testimony cited by Caruso because it will result in using an inordinate amount of trial time on relatively tangential issues.  In any case, Caruso's motion should be denied.

Finally, Defendants argue that monetary sanctions should be denied.  There has been an insufficient showing of spoliation.  Further, Caruso is recycling many of the arguments that were already considered and ruled on as part of the Sanctions Order.  Granting the motion would give Caruso a windfall, particularly since no new evidence has been brought forth from this motion.

*Legal Standard*

Courts have the inherent authority to impose sanctions against a party for the destruction or

spoliation of relevant evidence.  Leon v. IDX Systems Corp., 464 F.3d 951, 958 (9th Cir. 2006); Medical Lab. Mgmt. Consultants v. ABC, 306 F.3d 806, 824 (9th Cir. 2002); Glover v. BIC Corp., 6 F.3d 1318, 1329 (9th Cir. 1993).  A party engages in spoliation of evidence "as a matter of law only if [the party] had 'some notice that the documents were potentially relevant' to the litigation before [the evidence was] destroyed."  United States v. Kitsap Physicians Serv., 314 F.3d 995, 1001 (9th Cir. 2002).  "A party does not engage in spoliation when, without notice of the evidence's potential relevance, it destroys the evidence according to its policy or in the normal course of business."  United States v. $ 40,955.00, 554 F.3d 752, 758 (9th Cir. 2009).  The sanctions imposed for spoliation should be based upon, and take into account, the specific or unique facts of the particular case.  See Unigard Sec. Ins. Co. v. Lakewood Engineering & Mfg. Corp., 982 F.2d 363, 369 (9th Cir. 1992) (citing with approval Welsh v. United States, 844 F.2d 1239, 1246-47 (6th Cir. 1988)).  Sanctions for spoliation should not be imposed if the spoliated evidence does not have sufficient relevance.  See Ryan v. Editions Ltd. West, 786 F.3d 754, 766 (9th Cir. 2015); Akiona v. United States, 938 F.2d 158, 161 (9th Cir. 1991).  Further the absence of prejudice to the complaining party is a sufficient basis to deny sanctions for spoliation.  Ryan, 786 F.3d at 766.  The availability of other sources or types of evidence, in addition to the despoiled evidence, may be considered by a court in determining if a sanction is warranted.  See Medical Lab., 306 F.3d at 824-25.

Among the sanctions available to a court are default or dismissal of claims or defenses, preclusion of evidence, an adverse inference instruction, and monetary sanctions.  See Leon, 464 F.3d at 958-59; Glover, 6 F.3d at 1029; Unigard, 982 F.2d at 368; In re Napster, Inc. Copyright Litig., 462 F.Supp.2d 1060, 1078 (N.D. Cal. 2006).  Generally, preclusion of evidence is proper when the admission of such evidence would "unfairly prejudice an opposing party" because of the spoliation.  Unigard, 982 F.2d at 368; In re Napster, 462 F.Supp.2d at 1078.  "[A] trial court also has the broad discretionary power to permit a jury to draw an adverse inference from the destruction or spoliation against the party or witness responsible for that behavior."  Earp v. Davis, 881 F.3d 1135, 1143 (9th Cir. 2018); Glover, 6 F.3d 1318 at 1329; see Akiona, 938 F.2d at 161.  That is, a court may sanction the party responsible for the spoliation "by instructing the jury that it

may infer that the spoiled or destroyed evidence would have been unfavorable to the responsible party." Medical Lab., 306 F.3d at 824.  The adverse inference is based on two rationales, one evidentiary and one deterrent.  Akiona, 938 F.2d at 161. "The evidentiary rationale is nothing more than the common sense observation that a party who has notice that a document is relevant to litigation and who proceeds to destroy the document is more likely to have been threatened by the document than is a party in the same position who does not destroy the document." Id. The deterrent rationale seeks to use the inference to deter "parties from destroying relevant evidence before it can be introduced at trial." Id.  However, a "party should only be penalized for destroying documents if it was wrong to do so, and that requires, at a minimum, some notice that the documents are potentially relevant." Id.  "[W]hen relevant evidence is lost accidentally or for an innocent reason, an adverse inference from the loss may be rejected." Medical Lab., 306 F.3d at 824.  "A district court's adverse inference sanction should be carefully fashioned to deny the wrongdoer the fruits of its misconduct yet not interfere with that party's right to produce other relevant evidence."  In re Oracle Sec. Litig., 627 F.3d 376, 386-87 (9th Cir. 2010).

### *Discussion*

Based on the information submitted to the Court, the "Incident Report" for the incident of July 22, 2013 is a CDCR 837, which consists of various sub-forms/sub-reports, e.g. CDC 837-A, 837-B2, 837-C1, etc., and other related non-837 CDC forms.  A physical CDCR 837 is prepared by the Incident Commander and forwarded to upper level personnel for review; the physically submitted CDCR 837 is often referred to as the Incident Packet.  The sub-forms are completed by either the Incident Commander or a staff member who witnessed or was involved in the incident. Because the CDCR 837 technically contains a number "sub-forms"/"sub-reports," the Court will endeavor to reference a particular sub-report that may be at issue as a "sub-report" or through reference to the particular form at issue, e.g. CDC 837-A1.  The Court will not refer to any sub-report/sub-form as "the Incident Report."

1.    Adverse Inference Instruction

a.    Explanatory Fact-Finding Instruction

Caruso's request for a permissive adverse inference instruction is based largely on *Mali v.*

*Federal Ins. Co.*, 720 F.3d 387 (2d Cir. 2013).  *Mali* was an insurance dispute between an insured family (the Malis) and their insurance company regarding coverage for a fire that destroyed the insureds' residence, which was a converted barn.  See Mali, 720 F.3d at 389-90.  During the course of trial, a dispute arose regarding the existence of pictures of the second floor of the residence/barn.  See id. at 390-91.  The pictures had been referenced by the insureds' expert during trial (who claimed that the insureds had shown her the pictures) and were relevant to assessing the alleged loss of the insureds, including whether the insureds were making fraudulent claims.  See id. at 390-91.  The district court in relevant part instructed the jury:

> In this case, evidence has been received which the Defendant contends shows that a photograph exists or existed of the upstairs of what had been referred to as the barn house, but no such photograph has been produced. If you find that the Defendant has proven by a preponderance of the evidence, one, that this photograph exists or existed, two, that the photograph was in the exclusive possession of the Plaintiffs, and, three, that the non-production of the photograph has not been satisfactorily explained, then you may infer, though you are not required to do so, that if the photograph had been produced in court, it would have been unfavorable to the Plaintiffs. You may give any such inference, whatever force or effect as you think is appropriate under all the facts and circumstances.

Id. at 391.  The Second Circuit found no error with the instruction.  See id. at 391-94.  The instruction was not a sanction.  See id. at 393.  The instruction was an explanation of the jury's fact-finding powers because it explained "that in the event [the jury] found one fact to be true, it was free, but not required, to infer another fact from the first."  Id.

*Mali*'s rationale was adopted and a similar instruction was given in *Patriot Rail Corp. v. Sierra R.R. Co.*, 2015 U.S. Dist. LEXIS 102844 (E.D. Cal. Aug. 4, 2015).  In *Patriot Rail*, financial information in one party's control was promised to an expert, but never produced to either the expert or the opposing party.  See id. at *25-*27.  The financial information/documents were also the subject of discovery requests.  See id. at *20-*25.  After hearing argument, Judge Nunley gave the following jury instruction:

> You have heard testimony about evidence which has not been produced. Counsel for Sierra has argued that this evidence was in Patriot's control and would have proven facts material to the matter in controversy. If you find that Patriot could have produced the evidence, and that the evidence was within its control, and that this evidence would have been material in deciding among the facts in dispute in this case, then you are permitted, but not required, to infer that the evidence would have been unfavorable to Patriot.

In deciding whether to draw this inference, you should consider whether the evidence not produced would merely have duplicated other evidence already before you. You may also consider whether Patriot had a reason for not producing this evidence, which was explained to your satisfaction. Again, any inference you decide to draw should be based on all of the facts and circumstances in this case.

Id. at *27.  As in *Mali*, Judge Nunley rejected the argument that this instruction was a sanction and classified it instead as one that explained the jury's fact finding powers.  See id. at *30-*31.

The Court does not necessarily disagree with *Mali* or *Patriot Rail* that a permissive adverse inference instruction can be given to a jury to explain circumstantial evidence and fact finding, as opposed to being given as a straight sanction.  However, the circumstances of this case do not fit within those of *Mali* or *Patriot Rail.*

First, the Court reads binding Ninth Circuit authority to require that an adverse instruction be given against a party for that party's own acts of spoliation.  That is, the adverse inference instruction applies to a particular party based on that party's conduct.  See Earp, 881 F.3d at 1143; Glover, 6 F.3d 1318 at 1329.  Despite Caruso's arguments, she has presented no evidence that any Defendant destroyed or purged any reports relevant to this case.  Caruso has presented evidence that Defendants composed CDC 837-C and C1 sub-reports and had access to the ISU archives, but that is all.  There is no evidence that sufficiently links the actions of any particular Defendant to an act of purging or spoliation.  Under Ninth Circuit precedent, there does not appear to be a sufficient basis to impose an adverse instruction against any Defendant.

Second, it is unknown when any reports, be they drafts or originals, were purged or destroyed.  Defendants' response to Caruso's second set of interrogatories indicate that on February 5, 2018, the litigation coordinator informed defense counsel that the failure to find original reports in the ISU archive likely meant that the original reports had been purged.[7]  See Huang Decl. Ex. 7.  On May 4, 2018, the litigation coordinator opined that any original reports likely had been purged due to their age.  See id.  Defense counsel represented to the Magistrate Judge that CCWF believed that any original reports had likely been purged around July 29, 2013, when the amended CDCR 837 was signed and finalized.  See Doc. No. 166 at 5:16-17.

---

[7] Caruso has expressed concern that the ISU archive was not searched.  Based on defense counsel's declaration, the Court is satisfied that the CCWF litigation coordinator or those working at her direction did perform of search of ISU archive.  Only the amended Incident Report was discovered in the ISU archive.  See Huang Dec. Ex. 7.

1    Caruso argues that the deposition testimony of defendant Ingram shows that original sub-

2    reports or the original unamended Incident Report/CDCR 837 were still in existence and stored in

3    the DIRS system in July 2018.  However, given Ingram's clarifying declaration, that is not how

4    the Court reads Ingram's deposition.  Ingram's declaration indicates that when he was referring in

5    his deposition to "original" reports that he found in the DIRS archive, he was actually referring to

6    the draft documents that were produced to Caruso in February 2019 – the unsigned and

7    unamended CDC 837-A, CDC 837-A1, CDC 837-B1, and CDC 837-B2 sub-reports.[8]  See Doc.

8    No. 171 at ¶ 2.  Further, while Ingram related a conversation that he had with the litigation

9    coordinator over "original reports," it is unknown whether Ingram and the litigation coordinator

10   understood what each other meant by the term "original reports."  There was no further

11   clarification regarding what reports the litigation coordinator was actually referring to when she

12   spoke to Ingram.  There is simply a hearsay statement regarding a term that regrettably appears to

13   have different meanings to different people.  The Court cannot find that Ingram's testimony

14   sufficiently shows that either Ingram or the litigation coordinator discovered original unamended

15   sub-reports or an original unamended Incident Report in July 2018 that are different from the

16   reports that have already been produced to Caruso.  Therefore, the Court cannot hold that any

17   reports were purged or even existent during the pendency of this litigation or at any point when

18   any Defendant knew that litigation was either likely or had actually been initiated by Caruso.

19       Third, the *Mali* instruction is premised in part on a defendant having exclusive control over

20   the evidence at issue.  There is no evidence that any Defendant had exclusive control over any

21   reports, be they drafts, originals, or "amendeds."  The evidence (including the photograph

22   submitted by Caruso's counsel) suggests that the archive binders in the ISU office can be accessed

23   by anyone who walks into the ISU office, including ISU staff or any other CCWF personnel.

24   Further, there is no evidence that any Defendant was responsible for maintaining any aspect of

---

[8] The testimony presented to the Court indicates that a reporting officer must sign a sub-report, and to complete the signing process, the sub-report is printed and then physically signed by the reporting officer.  See Villegas Depo. 28:6-9, 44:6-25.  It does not appear that the DIRS system can save signed documents.  See id. at 88:12-15.  While the substantive aspects of a completed sub-report apparently could be saved in DIRS, the actual submitted form will not be saved in DIRS.  Technically, therefore, Ingram could not have viewed a completed "original" sub-report because the documents reviewed on DIRS would not have been signed.

1   DIRS or reports saved within DIRS, or that any Defendant was the only person responsible for

2   maintaining documents saved within DIRS.  Rather, the evidence indicates that Defendants and

3   other ISU staff could only enter information within DIRS, save information within DIRS, and

4   print forms.[9]  Finally, while draft forms were apparently found by the Use of Force Coordinator,

5   there is no indication that any Defendant had any connection to the Use of Force Coordinator or

6   access to that official's records or archives.

7        Fourth, *Patriot Rail* did not expressly require that a defendant have exclusive control over

8   spoliated evidence.  However, the requirement is implicit within the opinion.  The evidence at

9   issue, financial information relating to Patriot Rail's damages, was promised by the entity plaintiff

10  Patriot Rail to an expert.  It is reasonable to conclude that no other person or entity would have the

11  relevant financial information or documents to make a damages calculation than the entity who

12  maintained records of its own business practices and revenues from years past.  In other words,

13  given the representations made as well as the nature of the evidence at issue, it is clear that Patriot

14  Rail would have had materially sufficient control over the spoliated evidence to support the

15  permissive adverse inference instruction and meet *Mali*'s criteria.  In this case, the Defendants are

16  current and former correctional officers at CCWF who were required *inter alia* to complete forms

17  and reports.  Those reports were reviewed by upper level CCWF personnel and apparently stored

18  either in DIRS, the ISU archive, or the records of the Use of Force Coordinator as part of CCWF

19  policy or custom.  As discussed above, no Defendant appears to have had the responsibility of

20  maintaining or storing any reports in any of these locations, nor did any Defendant set any

21  document/evidence retention practice or policy.

22        In sum, given the absence of sufficient evidence that indicates when any reports were

23  purged, any evidence that sufficiently links any Defendant to an act of purging, and the absence of

24

---

[9] In the order on Defendants' motion for reconsideration, the Court noted that Ingram's ability to access DIRS
25  archives was contrary to deposition responses that indicated that Defendants did not have access to the DIRS archive.
Sometime after the July 2013 incident but prior to his retirement (sometime before January 2019), Defendant Sgt.
26  Ingram was promoted to the rank of lieutenant and was a Watch Commander in July 2018, the date he accessed the
DIRS archive.  Ingram's deposition indicates that it was because of his status as a Watch Commander that he had
27  access.  There is no indication that any other Defendant had access to the archives in any capacity or rank.
Additionally, simply because Ingram as a Watch Commander had access to the archives does not speak to his ability
28  to alter or save a pre-existing document or prevent the purging of a document within the DIRS archive.  Simply stated,
access does not equal administration.

1  evidence that shows any Defendant had exclusive or sufficient control over any purged report,

2  particularly at a time when the report existed and there was sufficient notice of litigation, the Court

3  cannot grant Caruso's motion for an explanatory permissive adverse inference instruction under

4  *Mali* and *Patriot Rail*.

5       **b.**  <u>Discovery Sanction</u>

6     The reasons expressed above with respect to an explanatory evidentiary instruction apply

7  equally to an adverse inference instruction given as a discovery sanction.

8     Additionally, there is another reason why an adverse inference instruction (either

9  mandatory or permissive) will not be given as a sanction.  As part of the sanctions motion filed

10  with the Magistrate Judge, Caruso requested an adverse inference instruction as a sanction.  The

11  Sanctions Order "granted in part and denied in part" Caruso's motion for sanctions.  However, the

12  only part of the sanctions motion that was granted was for monetary sanctions associated with the

13  costs of filing the sanctions motion.  That means of necessity that Caruso's request for an adverse

14  inference instruction was denied.  Pursuant to Local Rule 303(b), Caruso had fourteen days to seek

15  reconsideration of the Sanctions Order.  Caruso did not seek reconsideration of the denial of her

16  request for an adverse inference instruction, therefore the denial of that request is final.

17  Procedurally, it is improper for Caruso to now file what is a de facto request for reconsideration of

18  this aspect of the Sanctions Order.

19     Caruso argues that the Sanctions Order did not prohibit her from arguing that original

20  reports existed or about questioning the Defendants about original reports.  That is true.  However,

21  asking questions about various versions of reports is not the same as obtaining an adverse

22  inference instruction.  The Sanctions Order did not state that any adverse instruction was

23  appropriate or could be the subject of an additional motion.  While the Sanctions Order did not

24  expressly discuss the propriety of any adverse inference instruction, the Sanctions Order found

25  insufficient evidence of purposeful spoliation, concluded that all existing versions of the various

26  reports appeared to be in Caruso's possession, and only granted Caruso's motion with respect to

27  limited monetary sanctions.  That is, no basis for an adverse inference instruction was found in the

28  Sanctions Order, and the requested remedy of an adverse inference instruction was denied.

1    Caruso also argues that the Court has the inherent authority to review a Magistrate Judge's

2    orders.  That is true.  See Allen v. Sybase, Inc., 468 F.3d 642, 658 (10th Cir. 2006); Cole v. United

3    States Dist. Ct., 366 F.3d 813, 823 n.14 (9th Cir. 2004); Local Rule 303(g).  However, given the

4    finality effect of Local Rule 303(b), the Court in this instance would limit its review to arguments

5    of clear error, new evidence, or new legal authority.  The Court does not detect clear error from

6    any aspect of the Sanctions Order.  Further, Caruso has cited no persuasive evidence or law that

7    was not previously available to her at the time that the Sanctions Order issued.  Thus, there is an

8    insufficient basis for the Court to disregard the holdings of the Sanctions Order.

9    In sum, giving an adverse inference instruction as a discovery sanction is inappropriate.

10        2.    Monetary Sanctions

11   The discovery practices of Defendants were the subject of a prior sanctions motion.

12   Sanctions were awarded against Defendants for their failure to timely disclose unsigned draft

13   versions of CDC 837-A, A1, B1, and B2 sub-reports.  Arguments for additional sanctions for

14   discovery related conduct were rejected by the Sanctions Order, and Caruso did not seek

15   reconsideration of the amount of sanctions or of the scope of the sanctions awarded.  Caruso

16   argues that Defendants have still not produced originals or other versions of the various reports.

17   However, the Sanctions Order concluded that all existing versions of the reports have likely been

18   produced.  Defendants cannot produce what does not exist.  For the reasons discussed above, and

19   in light of the scope and amount of the sanctions awarded in the Sanctions Order to which there

20   was no objection or motion for reconsideration, the Court will not award any further monetary

21   sanctions at this time.

22        3.    Evidentiary Limitations

23   Caruso seeks two evidentiary prohibitions:  (1) prohibit discussion or reliance on original

24   reports by Defendants and Lt. Villegas, and (2) prohibit testimony regarding efforts to find any

25   non-produced reports.

26   Defendants oppose both of these evidentiary limitations.  However, Defendants'

27   opposition does not really appear to be an opposition.  The basis for the Defendants' opposition is

28   that the discovery process is irrelevant to any issues at trial and they do not foresee a need to elicit

testimony on these topics.  See Doc. No. 294 at 9:16-20.  If Defendants do not foresee a need or intend to explore the above two topics, then an order granting Caruso's request does not alter Defendants' trial plans at all.  Moreover, an argument that a topic is not relevant is in reality a concession that the topic should not be broached during trial – irrelevant evidence is inadmissible.  See Fed. R. Evid. 402; Crawford v. City of Bakersfield, 944 F.3d 1070, 1077 (9th Cir. 2019).  In other words, Defendants agree that the topics should not be explored.  Because both parties appear to agree, albeit for different reasons, the Court will grant Caruso's request and prohibit Defendants and Lt. Villegas from:  (1) discussing or relying on the content of their original/non-produced reports,[10] and (2) discussing the efforts that they took to locate any version of the Incident Report or any constituent sub-report.

       4.    Miscellaneous

       The amount of briefing and number of attorney and court hours that have been subsumed by issues surrounding the Incident Report or the constituent sub-reports is shocking.  Part of the confusion surrounding the reports appears to be that counsel, the parties, and witnesses not using terms such as "draft," "original," "amended," or "final" consistently or with a common understanding of the terms.  Part of the confusion also appears to be based on assumptions that an original Incident Report and the amended Incident Report were both submitted for full review, both were reviewed, and both were sent back to the ISU archive or kept by the Use of Force Coordinator.  However, there is no actual evidence that discusses what happens to an unamended incident report once an amended incident report is submitted within seven days of an incident, either in terms of further or complete review or document retention.  Given that CCWF personnel have more than seven days to review an Incident Packet, it is not clear that an unamended Incident Report would be retained.  Further, confusion may also apply in assumptions from the parties about what various witnesses truly understand about, and have actual knowledge of, the incident reporting process, effects on incident reports or sub-reports from an amendment, and document

---

[10] The Court notes, however, that it may be possible that Caruso opens the door to questions on this topic at trial.  See, e.g., Memory Lane, Inc. v. Classmates, Inc., 646 F. App'x 502, 503-04 (9th Cir. 2016) (citing Nguyen v. Southwest Leasing & Rental Inc., 282 F.3d 1061, 1067 (9th Cir. 2002)); United States v. Whittemore, 776 F.3d 1074, 1083 (9t h Cir. 2015); McCollough v. Johnson, Rodenburg & Lauinger, LLC, 637 F.3d 939, 954 (9th Cir. 2011).

retention policy (both physical storage and storage on DIRS).  Similarly, issues appear to arise

based on interpretations of deposition testimony or other discovery responses.  The interpretations

may or may not be what a witness was actually attempting to convey.  Finally, confusion is partly

based on positions and representations from Defendants in filings and hearings that do not

necessarily appear consistent.  Cf. Doc. No. 294 at 3:3-17 (suggesting that no other draft reports

were created other than those produced) with Doc. No. 293-7 (indicating in part that original

reports had been purged).

        Ultimately, much of the confusion will have to be answered by live testimony.  The parties

will be able to pose specific questions to the witnesses that clearly define terms; assumptions can

be shown to be true or false; witnesses can clarify or explain prior discovery or deposition

testimony.  However, this process will not be aided by any adverse inference instructions, as the

evidence and arguments submitted do not sufficiently support the giving of such an instruction

either as a sanction or a jury explanation.

        That being said, the Court will order defense counsel to submit one further declaration.

Interrogatory responses from the defendants indicate that uploaded documents in DIRS may not be

deleted.  From Villegas's deposition testimony, only CDC 837-A, CDC 837-A1, CDC 837-B1,

and CDC 837-B2 forms would be uploaded and thus, not deleted.  The Court is aware of no

testimony regarding CDC 837-C reports or whether such 837-C reports would or would not be

deleted from DIRS.  Further, apparently Ingram viewed the draft CDC 837-A, CDC 837-A1, CDC

837-B1, and CDC 837-B2 forms for this case in July 2018, yet those sub-reports were not

produced or found by litigation coordinators until February 2019.  For the sake of clarity, the

Court will order defense counsel and Defendants to cause a search to be conducted of the DIRS

archive for all CDC 837 reports for this incident, but with a particular emphasis on any CDC 837-

C or CDC 837-C1 forms in the DIRS archive since all defendants testified that they completed

these forms on DIRS.  Defense counsel shall submit a declaration that discusses what was

requested in terms of a DIRS archive search and what the response by CCWF was to the requested

search.  In particular, defense counsel will specifically state whether any sub-report was found that

was not previously disclosed to Caruso and expressly address any versions of the CDC 837-C or

CDC 837-C1 reports that were discovered and whether and when those versions of the 837-C's were disclosed to Caruso.  The Court views this as a discovery related matter; defense counsel's declaration will not be presented to the jury and will not be a part of the trial.  If any sub-reports are discovered as a result of this search that were not previously disclosed to Caruso, the Court will likely issue an order to show cause why sanctions like those awarded in the Sanctions Order should not be imposed.  Otherwise, there is an insufficient indication that any existing version of the Incident Report or any of its constituent sub-parts have been withheld from Caruso.

Additionally, at the last telephonic status conference, the parties were instructed to meet and confer and submit stipulations as to *inter alia* a status conference.  No stipulation was submitted.  Since the last status conference, there have been significant developments with the Court in terms of conducting jury trials.  Therefore, the Court will set a telephonic status conference for September 13, 2021.  The parties should meet and confer beforehand and be able to jointly propose several trial dates as part of the September 13 status conference.

Finally, this has been a contentious case with difficult issues and some acrimony.  Despite this and the imposition of discovery related sanctions, the parties' respective counsel continue to communicate and attempt to work together.  These efforts are not always successful, but they are nevertheless made.  The Court encourages the parties to continue to communicate and attempt to work through all issues in good faith, including issues surrounding the Incident Report or sub-reports, in order to present relevant and necessary evidence in the most efficient way possible to the jury.  The Court remains open to any stipulations that the parties may reach with respect to the presentation of evidence at trial.

## **ORDER**

Accordingly, IT IS HEREBY ORDERED that:

1.  Plaintiff's motion for adverse inference instructions and other relief (Doc. No. 291) is
    GRANTED IN PART and DENIED in part as follows:

    a.      Plaintiff's request for an adverse inference instruction as an explanatory instruction
            or as a sanction is DENIED;

b.   Plaintiff's request for monetary sanctions is DENIED;

c.   Plaintiff's request for two evidentiary limitations is GRANTED and Defendants and Lt. Villegas are precluded from:  (i) discussing or relying on the content of their original/non-produced reports, and (ii) discussing the efforts that they took to locate any version of the Incident Report or any constituent sub-report;

2.   As described above, Defendants and defense counsel shall cause a search to be conducted at CCWF of the DIRS archive in order to locate any incident sub-reports, but in particular CDC 837-C and CDC 837-C1 sub-reports, for the July 22, 2013 incident that have not already been disclosed to Caruso;

3.   As soon as possible, but no later than twenty-one (21) days from service of this order, defense counsel shall submit a declaration that describes the search of the DIRS archive that occurred and what the reported results of that search were (the declaration must specifically include a statement whether and/or what CDC 837-C or CDC 837-C1 forms were discovered);[11] and

4.   A telephonic status conference is set for September 13, 2021 at 1:30 p.m. (call-in information will be provided as the conference date approaches).[12]

IT IS SO ORDERED.

Dated:   August 9, 2021          _____

                                            SENIOR  DISTRICT  JUDGE

---

[11] If additional time is needed, defense counsel may file a request for additional time that explains why more time is needed.

[12] The Court is willing to consider additional dates to conduct the status conference, provided the parties can submit an appropriate stipulation.